## ALBERT SMITH, Complainant, Appellant,

*vs.*

## EPHRAIM MARINER, Appellee, impleaded with the La Crosse and Milwaukee R. R. Co.

APPEAL IN EQUITY FROM MILWAUKEE CIRCUIT COURT.

Where a party, intentionally or by design, misrepresents a material fact, or produces a false impression in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage over him, equity will regard such conduct as fraudulent, and will relieve against it.

Where one party gives information to another of facts, upon which the latter acts, and such information is wrong, and misleads him to his injury, the party giving such information is not answerable in damages, provided he believed the information to be true, and had no intention to deceive.

Where the complainant and defendant had one or more casual conversations about the time of a public sale of forfeited school lands, in which the defendant informed the complainant that the sale would be made on the 19th of August, when, in fact, the sale was to take place and did take place on the 11th of August, at which the defendant bid off certain lands in which the complainant was interested, the latter not attending the sale, nor redeeming the land before sale; it was held, that the defendant was not chargeable with fraud or misrepresentation, if he supposed the information to be true at the time he gave it.

A court of equity seldom interferes to mitigate a forfeiture expressly imposed by statute.

At any time before a re-sale of school lands, forfeited for non-payment of principal or interest, the purchaser may revive the contract of purchase, by the payment of the amount due and interest, and costs, with five per cent. damages on the purchase money.

The disposition of the school lands, as provided by the 24th chapter of the Revised Statutes, is not a sale thereof on credit, within the meaning of section 8, of article 10, of the Constitution. SMITH, J., *dissenting.*

The word "sale," as used in chapter 24, of the Revised Statutes, has a different signification from the word "sale," in section 8, of article 10, of the Constitution. SMITH, J , *dissenting.*

The disposition of school lands provided for by chapter 24 of the Revised Statutes, is a contract of sale, but not a sale, and hence is not repugnant to section 8, of article 10, of the Constitution. SMITH, J., *dissenting.*

The purchaser of school lands under the provisions of chapter 24 of the Revised Statutes is not an equitable mortgagor of the land for the unpaid purchase money

THE importance of the questions involved in this case justifies a full statement of the pleadings and evidence therein.

The bill was filed by the complainant setting forth that on the 15th day of June, A. D. 1850, at a sale of school and university lands, in the county of Milwaukee, in accordance with the provisions of chapter 24 of the Revised Statutes of the state of Wisconsin, Clinton Walworth became and was the purchaser of lot number 18, in township number 7 north of range number 22 east, in the southeast quarter of section number sixteen, according to the plats of said lands recorded in the office of the secretary of said state, containing seven acres and seventeen hundredths of an acre, for and amounting to the sum of five hundred and thirty-nine dollars and ninety-seven cents, of which sum the said Clinton Walworth paid at the time of purchase, fifty-four dollars and ninety-seven cents on account of the purchase money, and eighteen dollars and thirty-eight cents, being the interest money on the amount unpaid to the first day of January, A. D. 1851, and thereupon Wm. A. Barstow, then secretary of state, J. C. Fairchild, then state treasurer, and S. Park Coon, then attorney-general, and constituting the commissioners of the school and university lands, issued and delivered to the said Clinton Walworth their duplicate certificate number forty-one, Milwaukee county, bearing date the day and year first aforesaid, in which the purchase of the said lot at the time and for the amount and the payment of the sum aforesaid were recited and admitted, and in which said certificate it was provided, that if the said Clinton Walworth, his heirs, assigns, or other legal representatives, should pay to the state treasurer, at his office, the further sum of four hundred and eighty-five dollars. at any time within ten years from the date thereof, and also the interest annually in advance on the first day of January in each and every year, at the rate of seven per cent. per annum, and also all taxes properly assessed thereon, then the said Clinton Walworth, his heirs or assigns, would be entitled to a patent for the said lot of land hereinbefore described; and the said certificate further provided that the said commissioners might take possession and resell the said lot in case the said Clinton Walworth, his heirs or assigns, failed

to pay the balance of the purchase money and interest thereon as aforesaid, or non-payment of taxes as aforesaid, which said certificate was duly acknowledged by the commissioners before D. M. Seaver, a notary public.

" And your orator further shows, that at the time of making such purchase and sale of said lot of land as aforesaid, by the said Clinton Walworth, the money paid by him therefor as aforesaid was advanced to him by your orator; and that in consideration thereof, on the twenty-fourth day of June, 1850, the said Clinton Walworth duly assigned, transferred and delivered the said certificate of said lot, under his hand and seal, unto your orator, which said certificate and assignment thereon indorsed as aforesaid, are now in your orator's possession and ready to be produced as this honorable court may direct, and to which, when produced, your orator for greater certainty would refer. And your orator further shows, that under and by virtue of said purchase and sale, certificate and assignment thereof as aforesaid, your orator entered in and upon said lot of land and took and claimed possession thereof.

"And your orator further shows, that in pursuance of the terms and conditions of said certificate of sale, your orator caused to be paid to the state treasurer of Wisconsin, at his office in Madison, the sum of thirty-three and 95-100 dollars, in full for one year's interest in advance for the year 1821, on said school land certificate number 41, in Milwaukee county, as by the receipt therefor duly executed by the said treasurer, and countersigned by the secretary of state, now in your orator's possession, ready to be produced, will more fully and at large appear.

" And your orator further shows that he neglected to pay the interest due upon said lot on the first day of January, 1852, and also the interest due on the first day of January, 1853; but that the said commissioners, nor their successors in office, did not resell said lot until the time hereinafter mentioned and set forth.

" And your orator further states that he had the right to redeem said lot from the default which had arisen by reason of the non-payment of interest as aforesaid, at any time before a re-sale of said lot by the commissioners, or proper officers for that pur-

pose authorized, by paying to the state treasurer the amount of interest then due and unpaid, together with five per cent. damages on the amount of purchase money unpaid, and all costs occasioned by the delay, and to revive the said certificate thereby to its full original force.

"And your orator further shows, that some time in the latter part of the month of July, A. D. 1853, your orator was informed that said lot of land was advertised to be sold at Madison, for the non-payment of the interest money due thereon; which sale your orator was informed was to take place on the 11th day of August, A. D. 1853; but your orator states that he never saw said notice of sale at any time, nor did he know of the day of sale, except by hearsay; and that on or about the fourth day of August, 1853, in order to procure some portion of the money to pay said unpaid interest, costs and damages, and to prevent a re-sale of said lot, your orator applied to Ephraim Mariner, at Milwaukee, one of the defendants in this cause, for a loan of money to enable your orator to pay said interest, damages and costs as aforesaid, and informed the said Mariner that your orator wished to procure said money for the purpose of paying the interest, damages and costs due on said lot of land before the sale, and in order to prevent the sale, and stated to said Mariner that your orator was informed that said lot was advertised for sale on the said eleventh day of August, 1853, but that your orator had not seen the notice of the same. The said Mariner thereupon replied to your orator that he had not then the money to lend to your orator, and assigned as the reason why he had not, that he had then recently been paying up the interest due upon lots of his own that were advertised to be sold by the same notice, and for the same cause as the lot of your orator. Your orator replied, that then he, your orator, must look elsewhere for the money, as the term for redemption was nearly out; and the said Mariner then told your orator that there was no hurry, as the sale of said lot did not take place until the 29th day of August, 1853; to which your orator replied that he had understood the sale had been published for the 11th day of August, but had not seen the notice; and the said Mariner replied to your orator, that he, the

said Mariner, had so understood himself, but that he had sent out to Madison to pay some of the interest due upon lots of his own advertised to be sold at the same time as your orator's, and had learned from there that the sale of said lots would not take place until the said 29th day of August, 1853, and that he had a letter from his agent in Madison to that effect, and that there could be no mistake about it; and to which your orator replied, if that be the case, there is time enough to attend to the matter hereafter. And your orator further states, that the foregoing is all the information he had of the time when the said lot of land was advertised by the proper officer to be sold as aforesaid for the cause aforesaid; and that your orator fully believed the statements and representations of the said Mariner, so made as aforesaid to your orator, as to the time of said sale of said lot; and that the same was not to be sold until the said 29th day of August, 1853 ; and that such statements and representations of the said Mariner, so made as aforesaid, were the sole and only reason why your orator did not pay the interest, damages and costs due upon said lot on or before the said 11th day of August, 1853, before the same was sold for the non-payment of the interest thereon as aforesaid. And your orator further shows and states, that under the belief aforesaid, he did not pay said amount due upon said lot as aforesaid, on the said 11th day of August, 1853 ; and the first intimation your orator received to the contrary of such statement as aforesaid of the said Mariner, was on the evening of the said 11th day of August, or the day following, your orator is not certain which, the said Mariner informed your orator that the said lot of land had been sold on the said 11th day of August, 1853, and that he, the said Mariner, had become the purchaser on such sale; that the said lot of land had been bid in for him by his agent at Madison, on the sale thereof.

" And your orator further states, that he is informed and believes, that the said lot of land was so sold as aforesaid to the said Mariner for the sum of $816.50, that being the highest sum bid therefor, though your orator expressly states, that in his belief the said lot was worth at the time a much larger sum, and was then, and still is, fast increasing in value, and that on such

sale the said Mariner paid the sum of $80.50, and the further sum of $19.99 of interest on the whole sum unpaid up to January 1st, 1854, and took and received from the commissioners of the said school and university lands, or other proper person or persons, a duplicate certificate of the purchase and sale of said lot of land, and conditioned to pay the sum of $736, with interest thereon, in ten years from the date thereof, said interest being payable at the rate of seven per cent. annually in advance on the first day of January in each year, or within thirty days thereafter; and your orator is informed and believes, that the said Mariner has paid the interest due upon said lot on said last-mentioned certificate for the first of January, A. D. 1854. And your orator further states, that since the said sale of said lot of land, and the purchase thereof by the said Mariner, as hereinbefore stated, your orator has applied to the said Mariner to assign to your orator the said certificate so held by him as aforesaid, and has offered to said Mariner if he would do so to pay him the amount of money he had paid on said lot and purchase by him as aforesaid, and the interest money paid by him since said sale and purchase, and interest on the same at the highest legal rate, if he would so assign said article to your orator; which request of your orator the said Mariner refused, and still refuses to comply with; and your orator is still ready to pay to said Mariner the said sums of money so paid by him as aforesaid, with interest as aforesaid, and hereby offers to bring the said sum into court for the purposes aforesaid, on his assigning to your orator the said certificate so held by him as aforesaid free and clear from all other incumbrances upon or arising out of said lot of land, by, through or under the said Ephraim Mariner.

"And your orator further states that he has been informed, believes and charges, that at the time of making the statements and representations by the said Mariner to your orator, as hereinbefore stated, in reference to the time when said lot of land would be sold as aforesaid, and for some time previous thereto, he, the said Ephraim Mariner, knew that the said lot of land was advertised as aforesaid for sale, and that your orator was the owner of the certificate of sale so as aforesaid issued on the said 15th

day of June, 1850, and that said Mariner had before that time employed an agent, in Madison, to attend the sale and bid off said lot of land for him, the said Mariner, and had directed the said agent how much to bid for him upon said lot on the sale thereof, and to a much larger amount than was bid upon said sale; all of which facts the said Mariner concealed from your orator while pretending to your orator that he had not the money desired by your orator from him, for the purpose hereinbefore stated, and while pretending and representing to your orator that said sale would not take place on the said 11th day of August, 1853, as hereinbefore stated. And your orator further shows that since the said 15th day of June, 1850, the track of a railroad has been located over a part of said lot of land, and as your orator believes by the company known as the Milwaukee, Fond du Lac and Green Bay Railroad Company, and since the said 11th day of August, 1853, the damages to said lot have been estimated at the sum of $240, or thereabout, and that negotiations for the settlement of the damages to said lot have been had between the said Mariner and agent or agents of said company, and that some assignment of said certificate of sale of said lot has been made by said Mariner to said company, but the terms and conditions thereof are unknown to your orator; that by some arrangement the said railroad company has become consolidated with or in the La Crosse and Milwaukee Railroad Company, which company, as your orator has been informed, has become the owner of said road passing over said lot, and liable to pay the damages to said lot thereby, but that no final settlement or payment of damages has been made by said company or either of them, and that on the 5th day of April, 1854, your orator served upon the president of said last-mentioned railroad a notice in writing, forbidding said company settling with or paying said Mariner, or his assignees, anything for the damages to said lot as aforesaid, and of your orator's claim to the certificate held by said Mariner, and that your orator claimed an interest therein.

"And your orator further shows that he has been informed, and believes that said Mariner has threatened to assign said cer-

tificate of sale to some other person in order to put it beyond the reach of your orator, through the medium of this court, or otherwise; but your orator expressly charges that the said Mariner had said certificate of sale in his possession on the second or third day of June, 1854; and your orator submits that the statements and misrepresentations of the said Mariner to your orator in reference to the time of sale of said lot as hereinbefore detailed, in connection with the previous arrangements to purchase, and subsequent purchase of said lot of land, were calculated and intended to deceive, and did deceive your orator, and that the said Mariner, by reason of said purchase of said lot in the manner aforesaid, only acquired an equitable interest therein to the extent of the advances in money made by him as aforesaid, and interest thereon so paid by him as aforesaid; and your orator further states that said Mariner has made no improvements on said lot since the said 11th day of August, 1853.

"And your orator makes the said La Crosse and Milwaukee Railroad Company a defendant for the purpose only of preventing the payment of the damages to said lot by reason of the use of a part thereof by it as before stated, to the said Mariner or any other person, and requires it to answer only as to the matters hereinbefore stated in regard to the service of notice on them, and the consolidation of the said railroads, and the present condition thereof in regard to the damage to said lot.

"And your orator prays that the said Ephraim Mariner may upon his corporal oath, full, true and perfect answer make to all and singular the matters and things hereinbefore stated as fully and perfectly as though he were specially interrogated thereto, and that he be decreed to assign over and deliver to your orator the said certificate of sale of said lot of land so received and held by him as aforesaid, free and clear from all incumbrances made or arising out of or from said lot since the said 11th day of August, 1853, on your orator's paying to him the amount paid out by him for the purchase of said lot, and interest since paid by him, with interest on the same, and for such further, or for such other and further relief in the premises as may be agreeable to equity, and that in the meantime an injunc-

tion may be issued against the said Ephraim Mariner to restrain him from selling, assigning, or incumbering said certificate of sale so held by him as aforesaid, and from collecting or receiving any money or other valuable thing from any person or body corporate, for or on account of the damages to said lot by reason of said railroad track passing over the same, and said railroad company from paying any damages in their behalf; said injunction to be issued in the usual form under the seal of this court, with the usual penalty ; and that a subpœna may also be issued directed to the said Ephraim Mariner and La Crosse and Milwaukee Railroad Company, commanding them by a certain day and penalty to be and appear in this honorable court to make answer to all and singular the premises, and to stand to and abide such order and decree as this honorable court may make thereon, &c."

The defendant Mariner answered :

" This defendant further answering, says, that he is informed, and believes, that the interest due on said lot, according to the terms of the said certificate, was in arrear, and that said lot was advertised for sale, as in said bill of complaint set forth, but whether said complainant ever saw such advertisement, this defendant cannot state.

" This defendant further answering, states, that on or about the 8th day of June, 1853, this defendant was at Madison, and while there, was informed that the delinquent school and university lands were advertised for sale, and that such sale would take place on the 1st day of August next, thereafter ; that this defendant then employed an agent at Madison to attend such sale, and bid for him upon such lands ; that this defendant returned from Madison about the 20th of June, and shortly after his return met said complainant in the street, and had a conversation with him concerning said lot, in which the complainant said that he knew that said lot was advertised for sale, and that he meant to redeem it if he could get the money to do so; and then and there asked this defendant to loan him the necessary funds to redeem said lot, to which the defendant replied, that he had no money to lend, that he should have to borrow the money to pay some in-

terest for himself; that afterwards, and about the 3d day of August, this defendant had another conversation with the said complainant, in which he told said complainant that he had sent the money to pay his interest, but that he need not have been in so great a hurry, for he had a letter from his correspondent at Madison, saying that said sale would not take place till the 19th, and that he thought that the letter was reliable; that he should depend upon it, but did not say that there could be no doubt but that said sale should take place on the 19th.

" This defendant further answering, admits, that on or about the 11th day of August, 1853, the said lot was bid off for him by his agent, for the price mentioned in said bill, together with costs of sale, which was all that the said lot was worth at that time, and that he still holds the certificate of the commissioners of the school and university lands therefor.

" This defendant further answering, denies, that he did not, by reason of the promises, acquire an interest in said lands, except as a trustee of said Smith; the statements made by this defendant to said Smith were made in casual conversations; they were the best information that this defendant possessed, and when he made them he stated his authority and his means of information; they were made concerning a matter of which the complainant had equal facilities for knowing.

" This defendant further answering, denies, that for a long time previous to such sale, he had known that such sale would take place on the 11th of August, but insists that the only person from whom he ever heard that such sale would take place on the 11th day of August, was the complainant; that this defendant supposed, up to the 30th day of July, and until after he had sent the money to pay his own interest, that such sale would take place on the first day of August.

" This defendant further answering, admits, that he always told the said complainant that he had not the money to loan the said complainant, to redeem said lot; and he further says, that when said lot was bid off for him he had to borrow the money to pay for it.

" This defendant further answering, admits, that some time in

the month of May last, the said complainant did ask this defendant, that if he, complainant, should pay to defendant the money he had paid on said lot, and interest thereon, if this defendant would assign said certificate to the said complainant, and that this defendant refused to do so, but denies that the said complainant ever offered him the money; this defendant further says, that immediately after this defendant had learned that said lot was bid off to him, he went to the complainant and informed him if he had been misled by the statement of this defendant, and would pay the draught which the agent of the defendant had drawn to pay for said certificate, when the same should become due and payable, that this defendant would immediately assign said certificate to said complainant, to do which the said complainant wholly neglected and refused.

" This defendant further says, that said lot, and all property around the city of Milwaukee, has, since that time, greatly increased in value, and that this defendant was, and is unwilling to purchase and hold real estate for the benefit of the said complainant, or any other person.

" This defendant further answering upon information and belief, denies that the only reason for the failure of the said complainant to redeem said lot was the statements of this defendant, but insists that the want of the necessary funds had something to do with such failure.

" This defendant further answering, denies that he has threatened to sell said lot, or his interest therein, but has always insisted that he meant to hold the same unless some person would give him considerably more than it was worth, and he does still insist on holding the said lot as well against the said complainant as any other person.

" This defendant further answering, denies that the said railroad company has any interest in said premises whatsoever.

" This defendant therefore prays that the injunction heretofore allowed in this cause be dissolved, and that he be dismissed hence with his reasonable costs, &c."

Exceptions were taken to the answer of Mariner, and thereupon a further answer was put in, in substance as follows:

" The further answer of Ephraim Mariner, defendant, to the bill of complaint of Albert Smith, complainant, against Ephraim Mariner, and the La Crosse and Milwaukee Railroad Company.

" This defendant further answering, says that he had not on the 4th day of August, 1853, seen any advertisement of fixing the time of the sale of said lot 18 on the 11th day of August, 1853, nor has he ever seen any such advertisement; that the only knowledge he had of such sale was from hearsay, and that this defendant had not been informed that such sale would take place on the 11th day of August, until so informed by the complainant on or about the 4th of August, 1853; and he further says, that he did not know, and did not believe, that such sale would take place on the 11th day of August, until after the said 11th day of August, and until he was informed that such sale had taken place.

" And this complainant further says, that he did not know that the said complainant was the owner of said certificate except from report, but supposed he was.

" And this defendant further answering, says that he did on the 29th day of July, A. D. 1853, write to Madison, and direct his agent, Mr. Elisha Burdick, to attend such sale. and bid for him on said lot 13, among other lots then to be sold, and told him to bid as high as $135 per acre on said tract. And this defendant at the same time informed his said agent that such sale would take place on the next Monday after the said 29th day of July, to wit: on the first Monday of August, and did not inform him that it would take place at any other time. And this defendant further says that he is informed, and believes, that his said agent did not know that said sale was to take place on the said 11th day of August, until some time during the said 11th day of August, and after the sale had actually commenced, and a part of the lands advertised had been sold, and then learned it by accident.

" And this defendant further answering, says whether he did or did not inform the said complainant that he had employed an agent to attend and bid for him at such sale, he cannot set forth with certainty, but he admits that he did not tell him that he had instructed such agent to bid on this particular lot; and he

further insists that he was under no obligation to inform the said complainant as to his intentions in this respect.

" And this defendant further answering, says that he never did pretend to said complainant to know at what time said lands were advertised to be sold, nor did he ever tell said complainant that he had any advertisement of the time of such sale, but always informed him that he had not seen any such advertisement, and that he did not know, except from hearsay, of the time of such sale, and at the same time told the said complainant from whom he derived his information. And this defendant further says that the information which he gave said complainant was the best that this defendant could give. And when this defendant gave such information he believed it to be true. And this defendant insists that if the said complainant chose to rely on hearsay, instead of resorting to the advertisement for the time of such sale, that it is not the fault of this defendant. And this defendant further answering, denies that the said complainant had the right, under the laws of this state, to redeem the said lot after it had become forfeited, and after it had been advertised; and insists that said lot was, on the publication of such advertisement, subject to private entry in the same manner that any of the unsold school lands of this state are.

" And this defendant prays the same benefit and advantage from his answer in this behalf, as if he had demurred specially to said bill."

A general replication was filed by the complainant, and upon the issue thus made, testimony was taken by the respective parties, the material and substantive portions whereof are as follows:

To sustain the allegations of the bill, the complainant produced, as a witness, D. G. Power, who testified that " he was a land agent in the city of Milwaukee, and had been so engaged some four or five years; that he was acquainted with the parties and the premises in dispute, according to the description set forth in the bill of complaint; that he has had a conversation with defendant, Mariner, about the said lot of land; that said conversation occurred about one year ago, and that said conversation was substantially as follows: Mariner asked witness the

value of the lot; to which he replied, giving his opinion of the value of the land, and remarked to Mariner that it was owned by complainant, to which Mariner stated that he (Mariner), through mistake, informed the complainant that the said lot would not be sold until a certain time, and that in the meantime the lot had been sold, and he had bid it off, but that he did not want to take any advantage of Mr. Smith; in the same conversation Mariner told witness that the land had been sold for the non-payment of interest; that said conversation was had over a year ago; that he is unable to state positively when it was, at any rate it was shortly after the sale; not longer than a month after the sale; it may have been the very day after the sale, a week after, or two weeks after, cannot tell."

Also, F. J. Blair testified that "he was in Madison in 1853, in the month of August, when said lot was sold; it was bid off by Mr. Burdick; that he informed witness that he bid it off for Mariner; had a conversation with Mariner about the purchase of said lot after witness returned from Madison, which was about two days after the sale; the conversation was as follows: Witness informed Mr. Mariner that the lot had been bid off for him, and Mariner said he had informed Mr. Smith that the sale of said lot was to be a week or two weeks later; that M. expressed regret that it happened so, and that Mr. Smith neglected attending to redeeming it on account of the information Mariner gave him of the time it was to be sold; and that Mariner further said that he would let Mr. Smith have it at the bid he made for it, if Mr. Smith wanted it; witness further says he bid on the lot at the time of sale; that he understood from Mariner at said conversation that he (M.) was mistaken himself of the time of the sale; said conversation happened near Luddington's corners; has no recollection of any others being present at the time of said conversation; that at that time witness supposed from what Mariner said, it was the first he (M.) had heard of the sale; he said he supposed Mr. Smith was misled as to the time of the sale from what Mariner had told him (Smith); that witness is positive that Mariner said he had informed Smith that the sale would take place at a later day, and is not positive whether Mariner

Smith vs. Mariner.

told him that Burdick had written to him (M.) when the sale would be, or whether he (Mariner) had written to Burdick when the sale would be, and how much to bid, but that it is witness's impression that Mariner said he had written to Burdick that the sale was to be at a later day, and for B.. to attend the sale and bid in said lot; witness bid two or three times on said lot; that it is the impression of witness that the lot was bid off for more than was due on it, and stated to Mariner that it was bid off for all that it was worth, and he (M.) said he thought it was bid off for less than its worth; and witness said at the time he would not take the lot at the bid."

"If you had known complainant was not aware of the sale of the lot, and desired to keep it, would you have taken the lot for him?" (Objected to.) Witness says, "he thinks he would."

It was also proved on the part of the complainant, that the land was worth $300 or $400 per acre.

On the part of the defendant testimony was taken as to the value of the land, placing it at considerably less value per acre.

At the March term, 1855, the cause came on to be heard upon the bill, answer, replication and proofs, when the court below dismissed the bill, with costs, from which decree the complainant appealed.

*Ira C. Paine* and *Byron Paine*, for the appellant.

1. The appellant is entitled to relief on the ground that the defendant Mariner, by misrepresenting to him the time of sale, and then taking advantage of the misrepresentation to buy in the land himself, committed a fraud upon the appellant. 2 *Kent's Com.*, Part 5, *Lec.* 39, 482; *Taylor vs. Ashton*, 11 *M. & W.* 401; *Farnham vs. Brooks*, 9 *Pick.* 212; *Strong vs. Catton*, 1 *Wis. Rep.* 471; 11 *Vesey*, 623; *Smith vs. Richards*, 13 *Peters' Rep.* 26–36; *East vs. Mathews*, 1 *A. K. Marsh.*, 192; 8 *Howard*, 183; 3 *Shipley Rep.* 332; *Adams' Equity*, 176; 1 *Story on Equity*, 196–200; *Scott vs. Meritt*, 1 *Ves.* 2; 1 *Jacobs & Walker*, 94; *Middleton vs. Middleton*, 11 *Ves.* 620; 10 *Yerger*, 206; *id.* 94; 3 *Swanston R.* 408, *note*.

Even if Mariner did not know that his representation as to the

time of sale, was not true when he made it, then it was a mutual mistake, and the appellant is entitled to relief on that ground. But it is submitted that even in that case, the subsequent attempt, in pursuance of a previous design, to take advantage of the mis-take, by obtaining the land for himself, knowing the complain-ant's rights, however it may be regarded by the creed of specu-lators, amounts to little less than actual fraud, according to the standard of courts of equity. 1 *Story on Equity*, 202; *Notes* 5 *and* 6, *and cases cited; see also pages* 383–386; *also page* 421 *and cases cited in note* 3*d; Roosevelt vs. Fulton*, 2 *Cow.* 124; *Pearson vs. Morgan*, 3 *Broke Ch. Cases*, 388; *McFarran vs. Taylor*, 3 *Cran.* 270; 3 *Ark. Rep.* 386; *Bacon vs. Brownson et al.*, 7 *John. C. Rep.* 194, 202; *Lewis vs. Lemore*, 10 *Yerger*, 121, 206; *Wheelan vs. Wheelan*, 3 *Cow.* 537–576.

2. Considering the question as it is presented by the act for the sale of the school lands alone, there is great reason for hold-ing that the court should grant the relief prayed. ·

1st. The object of the forfeiture was to secure the payment of the unpaid purchase money. And this, unless there be ·some special reason to the contrary, brings the case within the well settled principle applicable to all cases of penalties and forfeitures intended to secure the payment of money only, against which equity always relieves on compensation, holding interest to be a · compensation. *Leading Cases in Equity, Vol. II, Part* 2*d*, 458–462, 470 *and cases cited;* 2 *Story on Eq.* 552.

2d. Here the forfeiture is created by law, and it is said equity will not relieve against such a forfeiture. But this doctrine does not rest upon principle. And the only authorities on which it is based, are the cases of *Peachy vs. The Duke of Somerset* (1 *Stra.* 447), and *Keating vs. Sparrow* (1 *Ball. & B.* 367, *cited in Lead-ing Cases in Equity, Vol. II, Part* 2, 450 *and* 467).

The first of these cases, rightly considered, does not sustain the doctrine, and the second rests upon the first.

3d. The true rule upon this subject would seem to be, that it is not within the province of a court of equity to relieve against a forfeiture imposed by statute, where such relief will defeat the clear intent and object of the statute, on the ground that such

Smith vs. Mariner.

intent and object are inequitable, thereby substantially repealing the law. But where the forfeiture is imposed by law, merely as collateral to the accomplishment of some other object, and relief can be granted without defeating such other object, there the same reasoning applicable to forfeitures in contracts applies, and relief should be granted.

The true criterion should be not whether the forfeiture was created by law or by contract, but whether relief can be granted consistently with the accomplishment of the purpose of the law or contract, as the case may be. `·? reasoning Vol. II, Part 2, Leading Cases in Eq., page 471.

4th. This rule would be in accordance with the frequent definition of equity, that it "mitigates the rigor of the law." See Story's Com. on Equity, Vol. I, p. 4, 10, 11, 12, 13, 17, 18. It comes within the definition of Sir Joseph Jekyll, on pages 15 and 16, which Judge Story cites with approbation, while he contends some are too liberal.

5th. Even if the cases of Peachy vs. Somerset, and Keating vs. Sparrow, are decisions against this position, if they do not rest upon principle, do they settle the question so as to bind this court? It is believed not; but that from the very origin and nature of the system of equity, precedent cannot be of such binding force as in law. And that if it be admitted that only one or two decisions have been made upon a question, and that they are wrong, the court may disregard them, and establish what it may believe to be the true rule. See St. Germain's definition, cited 1st Story's Com. 11. And Judge Story, although he contends against the liberality of some other writers, yet admits that equity may extend itself into untrodden fields, and that " it possesses an expansive power to meet new exigencies." Vol. I, page 60.

6th. In cases where public policy requires it, the courts have refused relief even against forfeitures created by the parties. As in the case of companies incorporated to carry on some public enterprise. 2 Leading Cases in Eq., part 2, 466. But that reason does not exist here, for relief is only asked on the payment of the highest interest, which is offered by the bill, and this ac-

complishes the very purpose of the school law, which is that the school fund may be drawing interest. *Story's Eq. Jur.* § 53.

7th. Even if the court should refuse to relieve against these forfeitures, in ordinary cases, it should relieve in this case. For in those cases where relief is generally refused, if there are any particular equitable circumstances that the court can lay hold of to justify it, it is granted. As where the forfeiture was caused by some fault of the party seeking to take advantage of it. *See Peachy vs. Somerset, cited above.* And here, although the forfeiture of the complainant's right was not caused by any fact of the defendant, yet the complainant was prevented by the misrepresentation (and fraud as it is claimed) of the defendant from protecting himself as he might have done under the law, and the defendant then took advantage of the misrepresentation, whether made by mistake or otherwise, to get the land himself. And this, as between these parties, places it on the same footing as though the forfeiture had been caused by some fault of the defendant, and he was seeking to take advantage of it. *Rogan & Walker*, 1 *Wis.* 527; *Bouv. Law D.* title " *Sale*;" *Sugden on Vendors*, 67, 211, 60 *bottom paging; Webster vs. Hobin*, 7 *Cranch*, 399; *Williams on Real Property*, 59.

3. But whatever doubt the court might have about relieving against a forfeiture in law, it is believed that the following point places the complainant's right to relief beyond doubt. That is, that by the controlling force of section 8, article 10, of the Constitution of this state, he is entitled to be regarded as a mortgagor, having all the rights of a mortgagor, and among them the equity of redemption.

1st. This section provides that provision shall be made by law for the sale of the school lands. Chapter 54 of the Revised Statutes makes such provision, and so far agrees with the constitution. But the constitution further provides that " when any portion of such lands shall be sold, and the purchase money shall not be paid at the time of the sale, *the commissioners shall take security by mortgage*, upon the land sold, for the sum remaining unpaid, with seven per cent. interest thereon, payable annually at the office of the treasurer." The statute en-

tirely disregards this provision of the constitution, and enacts that when the purchase money is not paid at the time of the sale, the commissioners shall give the purchaser a certificate giving him only a quasi interest in the land, liable to be forfeited and lost on the slightest default, the statute giving the commissioners the power on such default, to re-enter, take possession of, and resell the land.

The conflict between the act and the constitution is palpable. The latter clearly intends and provides that on the sale the title shall be conveyed to the purchaser, and if the purchase money be not all paid down, he shall give back a mortgage for the amount unpaid. The provision is positive that the commissioners " *shall* take security by mortgage " for the amount not paid at the sale, which necessarily implies a prior or contemporaneous conveyance of the fee to the purchaser. The commissioners are " authorized to execute conveyances to purchasers, and to discharge mortgages taken as security when the sum due thereon shall have been paid." These provisions point with irresistible certainty to a conveyance of the fee to the purchaser at the time of the sale, and the taking back of a mortgage as the security of the state for the amount unpaid.

The statute adopts an entirely different security. Section 19 provides that the title or fee shall remain in the state till patents are issued, *and that no patents shall issue except on full payment of the purchase money and interest.*

This entirely dispenses with those provisions of the constitution in relation to security by mortgage, making them inoperative and void.

2d. There is no room for dispute as to when the sale takes place. That, both by the constitution and the statute, both in law and fact, is, when the land is offered by the commissioners and bid off by the purchaser. Section 10 of the act provides that not less than ten nor more than seventy-five per cent. of the purchase money shall be paid " *at the time of the sale,*" and the balance at any time in ten years "*from* such sale," &c. . So throughout the act, and in the certificates themselves, the sale is treated as taking place at the time when the land is bid off by

the purchaser, or applied for and the application assented to by the commissioners.

The only question between the statute and the constitution is as to the time when the conveyance should be made, and the kind of security to be taken for the unpaid · purchase money. And on these points the conflict between the two seems too obvious for argument.

3d. If there be such conflict, the constitution must prevail. And the question then arises, what effect this will have on the sales of the school lands? To say that the whole proceedings were void, and no rights acquired under them, would be harsh and rigorous in the extreme, contrary to law, and not to be imagined in equity. But the remedial, beneficent power and nature of a court of equity may be here signally illustrated and made manifest. This is an instance where the maxim that equity will regard that as done which ought to have been done, applies with peculiar force. Acting upon this maxim, deciding that sales were made when these certificates were given, and that instead of these, conveyances should have been made to the purchasers, and mortgages taken back to the state, the court will consider this as done, and give the parties the same rights they would have if it had been done. Then the complainant stands in the position of a mortgagor, with an equity of redemption not foreclosed against him, and having offered full compensation, according as the court may order, is entitled to relief.

If any reasons of policy should be urged against this position, it would be a sufficient answer to say that the constitution is so written. And if the court cannot say that "a law has determined hardly," can it say that the constitution has determined unwisely? But there are no such reasons. The provisions of the constitution are as wise as they are just. They have regard to the rights of the purchaser as well as to those of the state ; and by having regard to his rights they hold out greater inducements to men to become purchasers. The provisions of the constitution are just, equal and beneficent, protecting both parties without injury to either. The provisions of the statute are harsh, rigorous and inexorable, shutting down with an iron and impass-

able gate upon the purchaser on the least default, leaving him liable to lose all his rights by a slight delay, or a temporary inability or misfortune. Leaving the constitution out of view, the spirit of equity would beget an equity of redemption against the provisions of this act. But here the court finds its favorite child, which it has begotten and to which it gave its own name and cherished against the fierce assaults of its enemies, and which it sent forth as a redeeming angel to temper justice with mercy, adopted by the constitution itself. Is there room, then, for hesitation? It would seem not, but that the court, hastening to plant itself upon the solid ground of the constitution, will say that the purchasers of the school lands shall not be cut off suddenly and forever by a slight delay, a temporary misfortune, or the tricks of designing speculators, but that they shall be protected against this evil by the benign influence of the equity of redemption.

*E. Mariner, p. p.* appellee, submitted the following points and authorities:

To entitle the defendant to relief in this action, the misrepresentation must be fraudulent. *Pasley vs. Freeman*, 3 *Term*, 51; 2 *Smith's Leading Cases*, 132; *Ward vs. Center*, 3 *John*. 271, 280; *Young & Otis vs. Covill*, 8 *John*. 23; *Allen vs. Addington*, 7 *Wen*. 10.

It must be concerning something in regard to which one party places a known trust or confidence in the other. *Laidlaw vs. Organ*, 2 *Wheaton*, 178; *Evans vs. Bicknell*, 6 *Ves*. 173; 1 *Story's Equity*, § 197.

And concerning something which is peculiarly within the knowledge of the party making the misrepresentation. 1 *Story's Eq.* § 200 *a; Baley vs. Merrill*, *Cro. Jac.* 386.

Must be of facts and certain. *Pasley vs. Freeman*, 3 *Term*, 51; *Starr et al. vs. Bennett*, 5 *Hill*, 303; *Salmon & Bebee vs. Sherwood*, 2 *Day*, 128; *Scott vs. Hanson*, 1 *Simons*, 13; *Trover vs. Newcomb*, 3 *Merivale*, 703.

And the party must be misled by them. *Scott vs. Lara*, *Peake N. P. R.* 226, *referred to in* 7 *Wend*. 20.

Smith vs. Mariner.

The facts constituting the fraud must be clearly proven. 1 *Story's Eq.* § 190.

The gravamen of the charge in the bill is fraud, failing in the proof of which, the complainant cannot be permitted to assume a new ground of complaint, as mistake, accident or the like.

*By the Court*, COLE, J. The testimony taken upon the hearing of this cause does not materially vary the case as it stands upon bill, answer and replication. It, therefore, becomes necessary, for a proper understanding of the charge of fraud and mistake, which are relied upon as grounds of relief in this case, to look at the principal allegations of complainant's bill, containing that charge, and such parts of the answer of the defendant, Mariner, as are responsive thereto.

The bill was filed in the Circuit Court of Milwaukee county, on the 8th of June, among other matters, stating in substance, that on the 15th of June, 1850, at a sale of school and university lands in the county of Milwaukee, in accordance with the provisions of chapter 24, Revised Statutes, Clinton Walworth became and was the purchaser of lot No. 18, in the southeast quarter of section 16, town 7, north of range 22 east, containing seven and 19-100 acres, for the sum of $539.97, of which he paid at the time of purchase $54.97 of the purchase money, and $18.38 for interest upon the balance unpaid up to January 1, 1851, taking from the commissioners a duplicate certificate, bearing date upon that day, in which the purchase of the lot, at the time, and for the amount and for the payment of the sum aforesaid, were recited and admitted, and in which said certificate it was provided that if the said Walworth, his heirs or assigns, should within ten years, pay the balance of the purchase money, interest annually in advance, at the rate of 7 per cent., and the taxes properly assessed thereon; that then said Walworth, his heirs or assigns, should be entitled to a patent for the said lot; and that the certificate also provided that in case of default in the payment of the balance of the purchase money when due, or

of the interest and taxes as aforsesaid, that then the commissioners might take possession of, and resell the said lot.

And further, that the certificate was properly assigned by Walworth to complainant on the 24th day of June, 1850, and that he took possession of the lot; also, that he paid the interest in advance for the year 1851, but neglected to pay the interest due for 1852 and 1853 ; that after default, and at any time before a re-sale of the lot by the commissioners, he had a right to redeem by paying the interest due, with 5 per cent. upon the purchase money, and all costs occasioned by the delay, and revive the said certificate thereby in its full original force.

That in the latter part of July, 1853, he was informed that the lot was advertised for sale on the 11th of August, 1853, for the non-payment of the interest, but that he had never seen the notice of sale; and that on the 4th of August previous to the sale he applied to the defendant, Mariner, for a loan of money to enable him to pay the interest, damages and costs, and revive his contract, stating to Mariner that he was informed the lot was advertised for sale on the 11th of August.

That Mariner declined accommodating him with the money, saying that he had not got it to spare, and also saying that he had understood that the sale had been published for the 11th, and had sent money to pay interest due upon his lots advertised to be sold at the same time as complainants; but that he need not be in a hurry, as the sale of the lot would not take place until the 29th of August, as he had learned from a letter *sent* to him by his agent at Madison, which letter was to that effect, and that there could be no mistake about it.

Further, that the sale did take place on the 11th of August, at which time the lot was sold, and bid in by Mariner through his agent at Madison ; and the complainant alleges that the only reason why he did not pay the interest, &c., before the 11th, was, that he fully believed the statements and representations of Mariner as to the time the sale would take place ; and that the first intimation he received to the contrary of such statement was from Mariner, who informed him directly after the sale, that the lot had been sold and bid off for him by his agent.

The bill charges, that at the time of making these representations, in reference to the time of the sale, Mariner knew they were false, knew that complainant owned the certificate, knew when the sale would take place, and had employed an agent at Madison to attend the sale, and bid off the lot for himself, Mariner; that these statements and representations, in connection with the previous arrangement for purchasing the lot, and the subsequent purchase, were calculated to deceive, and did deceive him, the complainant, and were a fraud upon his rights.

The bill prays for an answer, under oath, and that Mariner be decreed to assign over the certificate to the complainant upon being paid the amount of his disbursements and interest on the same.

Mariner answered, under oath, admitting the complainant had a claim to the lot set forth in the bill, and states that on or about the 8th of June, 1853, he was at Madison, and while there was informed that the delinquent school and university lands were advertised for sale, and that the sale would take place on the 1st day of August, next thereafter; that he then employed an agent to attend the sale, and bid for him upon such lands; that he returned to Milwaukee about the 20th of June, and shortly after met the complainant in the street, and had a conversation with him concerning the lot in controversy; that complainant said he knew the lot was advertised for sale, and that he meant to redeem it if he could get the money to do so, and asked the defendant to loan him the necessary funds for that purpose: to which request the defendant replied that he had no money to loan, and should have to borrow money to pay interest for himself, and that afterwards, and about the 3d day of August, the defendant had another conversation with the complainant, in which he told him that he had sent the money to pay his interest, but that he need not have been in so great a hurry, for he had a letter from his correspondent at Madison, saying that the sale would not take place till the 19th, and that he thought that the letter was reliable, that he should depend upon it, but did not say there could be no doubt but the sale would take place on the 19th. Mariner further says that these statements

were made to the complainant in casual conversations; that it was the best information upon the matter he possessed, and that when he gave it he believed it to be true; also when he made these statements, he gave his authority and means of informa· tion; and that they were made concerning a matter of which the complainant had equal facilities for knowing. He denies that he knew, previous to such sale, that it would take place on the 11th of August; insists that the only persons from whom he even heard that the sale would take place on that day was the complainant—and that he supposed, up to the 30th of July, and until after he had sent the money to pay his own interest, that it would take place upon the 1st of August.

In the allegations in the bill above set forth it will be seen that the complainant charges Mariner with telling what was false in reference to the time of sale, knowing himself when it would be, and that he made these statements with a fraudulent purpose, with the intention to induce him to act upon them, so that he might obtain an undue advantage over complainant by buying in the land for himself. If these allegations were sustained by the answer of Mariner, or established by the proofs, it would constitute a clear case of fraud. "For," says Justice Story (1 *Eq. Jur.*, § 192), "where the party intentionally, or by design, misrepresents a material fact, or produces a false impression, in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage of him; in every such case there is a positive fraud, in the truest sense of the terms; there is an evil act with an evil intent; *dolum malum ad circumre niendum.* To the same effect are the cases of *Pasby vs. Truman* (3 *Durnf. and East,* 23); *Evans vs. Bicknell* (6 *Ves.* 193); *Taylor vs. Ashton* (11 *M. & W.* 400).

But Mariner most distinctly and pointedly denies, in his an-swers, that when he had these conversations with the complain-ant, he knew the sale was advertised for the 11th of August, or would take place upon that day. On the contrary, he says that his impression, up to the 30th of July, had been, that it was advertised for the 1st of August; and that he had acted upon this presumption by remitting money to pay interest upon his

own lots. He states he told the complainant he had received a letter from his agent at Madison, saying the sale would take place on the 19th of August; that he thought the letter was reliable; thus giving just such information as he possessed, the correctness of which he did not doubt. If Mariner had received a letter of this import, and we must presume he had, as his answer in this respect is uncontradicted, and we think this matter is strictly responsive to the bill, it was natural he should place confidence in its statements. This sale was to take place at Madison, where the writer of the letter lived, and the notice of sale was given in the newspaper published there. The writer therefore possessed superior means of information about the sale, and it is not surprising that Mariner trusted him. But it is made a matter of observation in the argument, and properly, too, that this letter was not produced upon the hearing, or its absence accounted for; and it is said this circumstance casts suspicion upon the truth of the answer. And so, to some extent, perhaps it does. Still we have said we considered this part of the answer as being responsive to the bill, and consequently by a familiar rule of practice, must stand until overcome by at least one witness, and strong corroborating circumstances.

Another circumstance relied upon by the complainant to show a meditated fraud, is, that Mariner had employed an agent to bid upon this property, and that he concealed that fact from him. It will be admitted that Mariner had a perfect right to bid at this sale, as much so as any citizen. He says that he employed an agent for that purpose when at Madison, in June. Nor was he, in conscience and duty, bound to disclose this to the complainant? Or will the concealment of that fact authorize us in inferring that it was done with a fraudulent motive? There was no peculiar relation, no fiduciary character existing between the parties. And I think he might innocently withhold from the complainant the knowledge of his having employed an agent to bid upon the land.

Stress is laid upon another matter, that Mariner came to the complainant on the 3d of August, and communicated this wrong information as to the time of sale. But it does not very clearly

appear whether the complainant applied to Mariner, or whether the latter put himself in the way of the complainant and volunteered the information. Mariner says that the statements about the sale were made in casual conversations. There does not seem to have been any purpose or design to mislead, and in the absence of that most important ingredient of fraud, I think it quite immaterial whether Mariner sought him or not.

Again; it is said to be wholly immaterial whether Mariner thus misrepresented a fact he knew to be false, or made an assertion about the sale not knowing it to be true; for that the affirmation of what one does not know or believe to be true, is equally in morals and law as unjustifiable as the affirmation of what is known to be positively false. And that even if the party innocently misrepresents a fact by mistake, it is equally conclusive; for it operates as a surprise and imposition on the other party. 1 *Story Eq. Jur.*, § 193. In answer to the first proposition it is sufficient to say, that Mariner swears he gave the complainant such information in regard to the sale as he possessed, giving his means and source of information, *and believing it at the time to be true.*

And upon the point of mutual mistake, it must be borne in mind, that this was a *public sale*, that notice of the time it would take place, had to be by law, and was actually given in a newspaper published at Madison; that the means of information as to the sale were open to both parties; that Mariner had no control over the sale or over the commissioners, under whose directions it was to be made; and further, Mariner had not been employed professionally or otherwise to ascertain when the sale would take place. Neither were the complainant and Mariner holding the relation of contracting parties. Had they been upon a treaty for any contract, and had Mariner made a false representation upon the subject of the contract innocently, without any fraudulent motive, by which the complainant was misled, equity would grant relief and compel Mariner to make the representation good. To that effect are the cases of *Buxton vs. Lister* (3 *Atk.* 385); *McFerson vs. Taylor et al.* (3 *Cranch*, 270); *Smith vs. Richards* (13 *Peters*, 26); *East vs. Mathews* (2 *A. K. Marsh.* 192); *Taylor*

*vs. Fleet* (1 *Barb. Sup. Ct. R.* 473); *Lewis vs. McLemon* (10 *Yer.* 206); *Adams Eq. p.* 176 *et. seq.*, cited upon complainant's brief, and many others of the same import found in the books.   Or had not the means of information about the sale been equally open to the parties, and had the complainant applied to Mariner, being a party immediately interested in the subject matter of inquiry, as in *Pearson vs. Morgan* (2 *Bro. Ch. R.* 305); *Burrows vs. Lock* (10 *Ves.* 472); or *Bacon vs. Bronson* (7 *J. Ch. R.* 193); and had been misled, he would have been entitled to relief.   But such was not the case.   These parties have a casual conversation about a public sale, and the defendant states he is informed and be-lieves it takes place several days after it does.   At this sale the land is bid in for the defendant by an agent employed some weeks before.   In consequence of this misinformation the com-plainant says he did not redeem his land before sale.   Suppose the land had not been bid in by Mariner, but by somebody else, could the complainant have sustained an action at law for dam-ages against Mariner, for misleading him as he did?   The an-swer is obvious.   He could not, unless he could show that he had sustained damage, not by the mistake, but by the fraudulent design and deceit of the defendant.   If he could not sustain his action at law for damages arising from this mistake, I am unable to see, how, under the circumstances of this case, and the relation of the parties to the sale, subject matter, and each other, he can be relieved from the consequences of the mistake in a court of equity.

But the complainant places his title to relief upon another ground.   It is insisted that the object of the forfeiture provided for in the act, for the sale of the school lands, was to secure the payment of the unpaid purchase money, and that, therefore, this case falls within the principle applicable to all cases of penalties and forfeitures intended to secure the payment of money only. I am unable to accede to this proposition.   Section 15, chapter 24, R. S., provides that in case of non-payment of principal or inte-rest, when due, according to the terms of the certificate of sale, such certificate shall become void from the time of such failure, and the purchaser shall forfeit all right and interest in the land.

Subsequent provisions authorize the commissioners to advertise and sell forfeited school lands. This is not a contract between parties, where compensation can be given for the breach of a condition, or for the non-payment of money when it fell due; but it is a case where, by express enactment, the right and interest of the purchaser in the land are to determine upon default in paying principal or interest as it becomes due. Now, is it competent for this court to relieve against such a forfeiture? to say that the legal consequences expressly declared by the statute shall not ensue? Can it say that where the law prescribes there shall be a forfeiture, there shall be none; and for instance here, say that the second sale shall be null and void; thus virtually repeal and nullify an act of the legislature? I should require very clear and strong authority to show that courts had done this, before I would presume to go that length. But we have been referred to no case where a court has thus interfered to mitigate a forfeiture imposed by statute. The cases of *Peachy vs. The Duke of Somerset* (1 *Str. R.* 447); *Keating vs. Sparrow* (1 *B. & Beat.* 373, 374, *also cited in Leading Cases in Eq., Vol. II, part* 2, *p.* 448), whatever they may determine, certainly give no countenance to this doctrine, but the contrary. And those cases are relied upon by Justice Story to sustain the very opposite doctrine, in *see.* 1326, *Vol. II, Eq. Jur.* The expression of the legislative will is, in this case, most clear and explicit; shall it be defeated upon the ground and for the reason that the law is harsh and severe in its character? Grant that the law is oppressive, inequitable, rigorous in its operation; that by its provisions the purchaser, on the least default, occasioned, perhaps, by a temporary inability to obtain money to pay what was due on the certificate, or by misfortune, was liable to lose all his rights under the sale; yet I cannot see that he can annul or disregard those provisions. I do not feel called upon at this time to attempt a vindication of this act of the legislature, and to show that it is not justly obnoxious to any such strictures. But I remark in passing, that section 16 enables the purchaser, at any time before a re-sale, to revive the original contract by paying the amount due with interest, and all costs occasioned by the delay,

and five per cent. damages on the purchase money. Besides the re-sale could not take place without notice thereof being given in some newspaper. That was done in the present case, and it appears the re-sale did not take place until a year and a half after the first default was made. But it is not for us to pass upon the sound policy and wisdom of this law. Such considerations are properly addressed to the legislature, which has power to repeal or amend it. We can only inquire whether the act as it now stands, is in conflict with any provision of the constitution of this state. And this brings us to the last, and most difficult and important point in the case.

And in entering upon the discussion of this point, I observe, that while I should feel it to be a very delicate and unpleasant duty to declare an act of the legislature unconstitutional, particularly one like that under consideration, under which so many sales of real estate have been made, and so many rights become vested, yet I should feel it to be a duty from which I could not shrink, in a case free from all rational doubt. But if such a case were not presented, if I can give to the constitution and the law a reasonable interpretation, such an one as will permit the law to stand, I then feel it to be my imperative duty so to do, and declare the law valid. And this is a rule as I understand of all courts, which will not, in a doubtful case, pronounce an act of the legislature to be contrary to the constitution. . 4 *Whea.* 625 ; *Cow.* 564. But to return to the question, is chapter 24, R. S., in those provisions relating to the sale of the school lands, in conflict with section 8, article 10, of the Constitution of this state ? The first two clauses of that section of the constitution are the only ones which have any bearing upon the question and read as follows :

" Provision shall be made by law, for the sale of all the school and university lands, after they shall have been appraised; and when any portion of such lands shall be sold, and the purchase money shall not be paid at the time of the sale, the commissioners shall take security by mortgage upon the land sold, for the sum remaining unpaid, with seven per cent. interest thereon, payable annually, at the office of the treasurer. The com-

missioners shall be authorized to execute a good and sufficient conveyance to all purchasers of such lands, and to discharge any mortgages taken as security, when the sum due thereon shall have been paid."

What is the obvious meaning, scope and design of this pro- vision ? It evidently contemplates that the school lands, or a part of them, at least, might be sold upon credit ; that the legis- lature, in the exercise of its discretion over them, looking to the situation of the country, the educational interests of the state, and the best method of enlarging the school fund, might thus determine and provide. But what is the nature and kind of the sale here spoken of, and which was contemplated by the consti- tution to take place ? In its popular and general sense, the word " sale" does not always convey the same precise meaning. We speak of a man's having made sale of his farm, when he has only made a contract to sell. In the above provision the word is used in a more restricted and technical sense. It is here used to denote a transaction, where the fee to the land sold passes out of the state, and becomes absolutely vested in the purchaser. That this is the nature of the sale here spoken of, is apparent from the context. ·For it provides, that when such a sale is made upon credit—that is, a sale within the purview of its provisions —the commissioner shall take security by mortgage upon the lands sold, for the sum remaining unpaid. Now, the giving of a mortgage, in its general acceptation, implies the conveyance of the legal estate, as security for the payment of a debt. The sale then contemplated by the constitution, and intended to be regu- lated by it, was a sale, in the absolute sense of the term, where and by which the purchaser becomes completely vested with the legal title to the land sold. And when that took place, and the money was not all paid at the time, then the commissioners were to take security by way of mortgage. And why were they re- quired to take a mortgage in such a case ? What was the ob- ject and end of the constitutional provision ? What evils was it intended to prevent, what mischief to guard against ? Was it designed to protect the purchaser of the school lands ? to guard his interests ? to establish the mortgage relation between him

and the state, for the purpose of giving him the benefit of an equity of redemption? Or had it an entirely other and different object in view? Was not its main, its primary, its only object, the protection of the school fund? to guard that from being squandered and lost? to prevent the legislature from making any provision for the sale of the school lands upon credit, without having, at least, the land sold as security for the debt? Otherwise, the legislature might have provided for the sale of the lands upon credit, permitting personal security to be taken, or security upon lands where the title was doubtful, or of less value than those sold. Hence, this restriction upon the legislature and the commissioners, that when the lands should be sold upon credit, and the title pass out of the state, and become fully vested in the purchaser, a mortgage, by way of security, should be taken upon the lands sold. Such seems to be the meaning, scope and end of the constitutional provision. Does the statute violate it as thus interpreted?

A material distinction will be at once noticed between the sale contemplated by the constitution, and the one which takes place under the provisions of the statute. For though by the statute the school lands are sold upon credit, and though the word " sale " frequently occurs in the statute, yet that word has a different signification in the statute from what it has in section 8, article 10. This is manifest from the connection in which it is used. The sale made under the statute is not attended with the same legal consequences as the one spoken of in the constitution. The fee to the land does not pass by it to the purchaser; it remains in the state. Section 19 says: " The title or fee of all school and university lands shall remain in the state until patents shall issue for the same, and no such patent shall issue except upon full payment of the purchase money and interest." By the sale mentioned in the constitution, the purchaser acquired, or would acquire, a perfect title to the lands—the right of possession and the right of property. He would be the substantial owner of the land, and might exercise the rights of an owner over it, providing, of course, he did not commit acts of waste. But I think the estate acquired by the certificate of sale is infe-

rior to that of a mortgagor. He has the right to the possession for the purpose of cultivation and improvement. But this right is liable to be forfeited under the act, and by the very terms of the certificate, upon default in paying principal or interest, or taxes, as they become due, or thirty days thereafter. Section 24 would likewise seem to limit and qualify this estate. *See also section* 106. But, however this may be, I think the nature of the sale provided for under the statute different from the one contemplated by the constitution, and to which the constitutional inhibition applies.

Furthermore, it seems to me that the main purpose, the great objects of the constitutional provision, are completely accomplished by the statute. If, as already observed, that object were the preservation of the school fund, holding the land as security for the sum due, that end is fully obtained. The state does now hold the lands as security until all is paid. The means of security proposed by the statute, are less expensive, equally safe, and in all respects for the state, more desirable than the giving of a conveyance and taking a mortgage. The situation of the purchaser might have been better, and his interests more secure, if upon the sale, the lands had been conveyed to him in fee, and a mortgage taken by the state. But the school fund, and the interests of the state, would not be as well protected as now; and should the law be declared unconstitutional for that reason? Is it a good and solid objection to the validity of this law, that it proposes a method of disposing of the school lands, equally, if not more, efficacious and safe, and as fully accomplishing all the objects of the constitution as the method prescribed in that instrument? It will not be denied that in the absence of this constitutional inhibition, the legislature might have made any provision for the sale of the lands it had deemed proper, applying the proceeds to the purposes of the grant. Its power over them is now restricted, so that they cannot be sold upon credit, transferring the title, without taking mortgage security.

It would be fatal to the complainant's case to hold this act unconstitutional, and the sales under it null and void. He derives title from a sale under the act, and if that should fall, his rights

would fall with it. To escape this inevitable conclusion, he is forced to maintain that the law is not wholly unconstitutional, but is rather an act of imperfect legislation; that the legislature having acted upon the subject matter and attempted to make provisions for the sale of these lands, but not having conformed in all respects to the requirements of the constitution, it is in the power of this court, and its duty, to supply the defect and effectuate the objects of the constitution. I have already stated that I conceive these objects more fully attained by the statute. But suppose I am wrong, it is not very intelligible to my mind how this court can supply the defect. It possesses no legislative power. That is vested in the legislature. To the legislature also belongs the duty of making provision for the sale of the lands. If it has acted imperfectly, can the court interfere and make a law for it? Can this court say, "true, the legislature has attempted to make provision for the sale of these lands, but has failed, or not made a suitable provision, and therefore I will make it?" It is said to be analogous to a case where equity aids a defective execution of a power in order to effectuate the intention of the parties. Courts of equity do this undoubtedly, so that the manifest intention and object of the parties may not be defeated by any blunder or mistake they have made. I do not think the analogy holds good, for the reasons already suggested. But suppose it does, and that it is competent for the court, not only to expound the law as it is, but to give it new scope and import, as it conceives it should have; is the attitude of the complainant's case improved if we hold the sales under the act good, and that the certificate of sale stands at once in place of a deed conveying the fee and a mortgage for the purchase money? If the certificate of sale is considered to be an equitable mortgage, is there not upon the re-sale a statute foreclosure of the equity of redemption? True, the statute says nothing about foreclosing an equity of redemption. The statute goes upon the idea that the certificate is rather a contract of sale, than an absolute sale and conveyance of the title: that the fee remains in the state until the patent issues. But by the re-sale it does most clearly profess to to cut off and bar all the rights and interest of the purchaser

under the certificate, whatever those rights may be. If upon the re-sale the land brings more than sufficient to pay the amount due upon the certificate, interest, costs and five per cent. damages on the purchase money, the residue goes to the original purchaser. *Sec.* 17. The act also provides that he shall be paid for his improvements upon the land. *Secs.* 24, 30, 31, 45, 46. But it seems to me that all his rights, legal and equitable are barred and cut off under the act by the re-sale, so that in whatever light I view the case, it seems to me the decree of the court below in dismissing the complainant's bill, must be affirmed, with costs.

SMITH, J., *dissenting.* There are one or two questions involved in this case which, in magnitude and importance, rise far above the other matters submitted for our consideration, affecting not only the parties to this suit, but extending to most of the transactions of the school-land department. It has, therefore, been long and frequently under consideration, and has received all the study and care which we have been able to bestow upon the subject. Having arrived at a conclusion which, in my mind, admits of no doubt, I deem it my imperative duty to state that conclusion as briefly as possible.

To understand fully the questions involved, it becomes necessary to examine the constitution of the state, and the various statutory provisions in relation to the disposition and sale of the school lands. And it is worthy of remark, in the outset, that these lands, set apart for the purpose of raising a fund for the support of education, were deemed of such primary importance that the people were unwilling to leave the disposition of them altogether to the discretion of the legislature, but restricted the power of that body certain constitutional enactments.

Section 7 of article 10 of the Constitution provides as follows: " The secretary of state, treasurer and attorney-general shall constitute a board of commissioners for the sale of the school and university lands, and for the investment of the funds arising therefrom."

"Section 8. Provision shall be made by law for the sale of all school and university lands after they shall have been appraised, and when any portion of such lands shall be sold, and the purchase money shall not be paid at the time of sale, the commissioners shall take security by mortgage upon the land sold for the sum remaining unpaid, with seven per cent. interest thereon, payable annually at the office of the treasurer. The commissioners shall be authorized to execute good and sufficient conveyances to all purchasers of such lands, and to discharge any mortgages taken as security, when the sum due thereon shall have been paid."

Immediately after the organization of the state government, the legislature, in view of, and, as they doubtless supposed, in obedience to the requirements of the constitution, devised and adopted a system designed to fulfill all the requirements of that instrument, and to dispose of the school lands and their proceeds in conformity with its injunctions. Accordingly an act was passed, developing and defining the system so adopted, which is found substantially in the Revised Statutes, in chapter twenty-four, entitled "Of the school and university lands, the sale and superintendence thereof, of the investment of the funds arising therefrom, and the powers and duties of the commissioners of said lands."

The declared object of this act is to provide for the *sale* of the school lands. No other disposition of them is contemplated or intimated. Every section and phrase of the chapter having reference to such disposition conveys the idea of a *sale*. The language used throughout is that of "*sale and purchase*," "*vendor and vendee*." It seems to be impossible to conceive that the legislature had any other object in view than that of a *sale* of the lands. And it is equally certain, that the main, leading idea of the act is, that these lands shall be sold upon credit. How, then, can it be possible otherwise than that the constitutional inhibition, or rather regulation, must apply that the security for the unpaid purchase money shall be by way of mortgage, and that all the rights and relations between the state and such purchaser must be those of mortgagor and mortgagee?

It would be a laborious task to refer to, or to quote, all the provisions of the act in question going to show that the disposition of the lands thereby authorized is essentially that of a sale; so intended by the legislature—so considered by the purchaser, and so in law and in fact. Without going over and reciting the whole of these provisions of chapter twenty-four, it will answer the present purpose to refer to a very few, out of the very many, and to the one, and it is believed the only one, which can in any degree tend to reduce the disposition of the lands authorized by the act below the character of a *sale*.

And first, the title of the act expressly declares the object and intent of the legislature. It was not to lease the lands, not to contract them for sale, not to pledge their usufruct, not to create an equitable lien upon them, but for the "sale and superintendence thereof, and for the investment of the funds arising from the proceeds therefrom." Investment of what funds? Not from those arising from the superintendence of them, for none such could arise to any considerable amount, but from the sale thereof. This is clear and certain from the fact that no other superintendence of the lands, except that of sale, which could produce any revenue, is authorized by the act. It is true the commissioners may protect the lands from spoliation, but the "proceeds" spoken of are those arising from the sale, and nothing more nor less.

Their every step in the programme of procedure is prescribed in order for the appraisal, price, sale, purchase, payment for, and on payment of conveyance in fee of the lands.

The first section of chapter 24 follows very nearly the language of section 7 of article 10 of the Constitution, thus showing that the act was passed in reference to, and, no doubt, as was intended to be in conformity with the mandates of that instrument, declaratory of the persons who should be commissioners for the superintendence and sale of the school and university lands, and for the investment of the funds arising therefrom. The second section provides that the said commissioners shall, before the 15th day of December, 1850, "offer for *sale, at public auction*, all the lands, &c.," and that they may have the power to withhold from such "*sale,*" &c.

Provision is made also in the the act for preemption rights that had accrued or that might accrue. To what has the term preemption reference but to a sale, prospective indeed, but nevertheless the right of purchase and the obligation to sell, and the terms fixed upon the like credit as of other sales?

Section 4 fixes the minimum price at which the lands may be bought. The next section provides that all lands shall be sold at public auction in the county in which they are situated, upon public notice being given; the auction sale is to be continued from day to day, precisely after the manner of the public lands of the United States. Each tract is to be offered for sale separately at the minimum price, and is to be struck off to the highest bidder; but if the minimum price is not bid, the tract is to be set down as "unsold."

Section 10 prescribes the terms of payment on which the lands are offered for sale: "The terms of payment on the sale of all school and university lands shall be not less than ten per cent. nor more than seventy-five per cent. of the purchase money to be paid at the time of sale, as shall be determined by the commissioners, and interest on the balance to be paid the first day of January next following, and the balance of the principal in one or more installments at any time within ten years from the time of sale, at the option of the purchaser, with like interest payable annually in advance." Upon the close of the sales, each day, the purchaser is required to pay the amount of purchase money required by the terms of sale, and in case of failure the lands are to be again offered; and moreover, in case he refuses or neglects to make such payment before the lands are again offered, he is liable to a penalty of twenty-five dollars for every tract on which he makes such default. After the lands have been thus offered at public sale, they are subject to private sale, at the office of the commissioners, and are there sold at the appraised value, and a certificate given as in other cases.

Now, in view of this language and of these provisions, did or did not the legislature intend a sale of these lands? If they did not intend a sale, what did they intend? What does this language mean? In case a "purchaser" bids off a tract of land at

one of these "auction sales," and pays down at the time of "sale" seventy-five per cent. of the "purchase money," does he thereby become a purchaser or not? If not, what relation does he bear to the transaction? If he is a purchaser, how, under the constitution, shall the remaining twenty-five per cent. of the purchase money be secured? The constitution says by mortgage on the land sold. Is there any possibility of construing this transaction into anything else than a sale?—a sale, too, executed so far that a court of equity may enforce a conveyance in conformity with the constitutional requirement? Here is no contract or agreement to sell at a future day, but it is a present operative contract of sale. The purchaser takes possession and assumes dominion. The minds of the parties have met, the amount required to be paid down is paid and received; it is complete except only the written evidence of its execution, which, as before said, equity would enforce.

But this act provides, that·upon the sale of the lands as before described, the commissioners shall issue to the purchaser a certificate of such sale, specifying the purchase price, the amount paid down, the amount remaining due, when payable, &c., and it is further provided, that "the title or fee of all the school and university lands shall remain in the state, until patents shall issue for the same, and no such patent shall issue except upon full payment of the purchase money and interest." The constitution, however, is mandatory to the commissioners, to take security by mortgage upon the land sold, for the amount. remaining unpaid at the time of sale.

This statute also provides, that in case of the non-payment of either principal or interest when due, according to the terms of the certificate of sale, such certificate shall become void from the time of such failure, and the purchaser shall forfeit all right and interest in the land described in such certificate, and the commissioners may take immediate possession thereof and resell the same in the manner provided.

In view of the constitution before quoted, was it competent for the legislature to forfeit in such manner the right and interest which the purchaser acquires by his purchase at such sale?

He has paid part of the purchase money but not all, and that which remains unpaid must be secured in a constitutional manner. That manner is by mortgage on the land sold. The effect of the constitution is, to create the relation of mortgagor and mortgagee between the state and purchaser, whenever part of the purchase money remains unpaid at the time of sale, and it is not in the power of the legislature to alter that relation.

In view of these provisions of the statute, together with many others which I cannot quote at length, it is impossible for me to bring my mind to any other conclusion—nay, every other conclusion is repelled by my reason and judgment—than that the act of the legislature provided for, and contemplated a sale of the school and university lands upon a credit, and for nothing else· If the disposition of the lands prescribed by the act is not a sale, then it is a cheat, a fraud, utterly unworthy of the state or its officers. But as we have before seen it is a sale, it was intended to be a sale, the language of the act induced all persons to believe that it was to be understood and treated as a sale, and to treat the transaction differently now would be, as I am compelled to say, a deception and a fraud upon purchasers. Indeed, there *can* be no purchaser but upon a sale. They are correlative terms, and it is impossible for me by any device of reasoning to impair their force. The conclusion is irresistible, that if these lands were sold, and the whole purchase money was not paid at the time of sale, security for the balance was required by the constitution to be taken by mortgage on the land sold. If not so taken in fact, it would attach in equity and be enforced, like other equitable mortgages. The relation of the purchaser to the state would be that of a mortgagor, to whom all the rights and incidents of such relation would necessarily apply, and among them the equity of redemption.

If these views be correct, it follows, either that the disposition of the school lands in accordance with the provisions of chapter 24 of the Revised Statutes, is unconstitutional and void, or that such disposition can be held to be a good sale in equity, evidenced by the written memorandum, or certificate, part of the purchase money having been paid, and the state an equitable

mortgagee for the remainder. That this latter is the correct position I have no manner of doubt. Transactions of a similar kind between individuals are frequently so construed and enforced. Such a construction would carry out the plain intention of the constitution, which necessarily overrides the statute, whenever the latter is repugnant, and establishes the equity of redemption, resulting from the transaction, and which the constitution contemplates and creates.

It is apparent therefore, if these views be correct, that the provisions for the absolute forfeiture of the right and interest of the purchaser in the lands, on the failure to pay the balance and interest on the day mentioned in the certificate, are repugnant to the constitution, because they are incompatible with the constitutional rights of such person as a mortgagor, and that the forfeiture and re-sale of the lands mentioned in the complainant's bill were illegal and void.

I do not deny the legislature the power of providing a mode of foreclosing the equity of redemption which attaches to these transactions, other and different from the ordinary mode. But they have not done so, nor made any attempt to do so. Until some other mode is adopted *for that purpose*, the ordinary proceeding for foreclosure must be followed. The taking possession of the lands and offering them for re-sale is not a foreclosure. The forfeiture does not become absolute so that the lands may be retaken and sold, until the equity of redemption is extinguished in some way. To call the proceedings prescribed by the statute for taking possession of forfeited lands and reselling them, a form of foreclosure would be a gross perversion of terms. They are advertised as other lands, sold as other lands ; the original purchaser having, it is true, a right of preemption until the day of sale, if he shall be so fortunate as to ascertain it. The idea of foreclosing an equity of redemption cannot be gathered from all these provisions. Indeed, to admit that this is a form of foreclosure would be fatal to the whole act, as it would admit the constitutional right of a mortgagor in a credit purchaser, which the statute seeks to evade. To deny to the purchaser the rights of a mortgagor, on the ground that there was no sale

under the statute, and then to maintain that such rights have been foreclosed under the same statute, is equally uncandid and unjust, not to say irrational and absurd. It is blowing hot and cold in the same breath.

Much reliance is placed upon the 19th section of chapter 24, which is as follows:

"The title or fee of all school and university lands, shall remain in the state until patents shall issue for the same, and no such patent shall issue, except upon full payment of the purchase money and interest."

To give this section the full effect contended for, would be to nullify the provisions of the constitution, that the lands may be sold on credit. No title shall pass until patent given, and no patent shall be given until full payment, and, therefore, no payment, short of the full amount shall constitute a sale; in other words that the patent is the sale, and not the agreement of the parties.

The term sale is evidently the same in the constitution as in the statute.

It is contended, that inasmuch as this section provides that the title or fee shall not pass until the patent issues, and the patent shall not issue until full payment; therefore, there is no sale of the lands, until full payment is made, and patent issued. In other words, that the disposition of the lands prescribed by the statute, is a contract for sale, and not a sale.

Such a construction however, does violence, not only to the language, but to the obvious intention and idea of the whole act. From the commencement to the close, from the title to the last word, a sale of the lands, nothing less than a sale, is contemplated and provided for. Even if the absolute passing of the title were essential to constitute a legal sale, that is to say, a sale, full, absolute and perfect in law, every one knows that it is not so held in equity. But it is not so in law. The delivery of the deed is not the sale of the land. It is, indeed, the evidence of its consummation, but not the fact of sale. Whether the legal title passes or not at the time of the sale, it is none the less

a sale, and if all other conditions of the sale are fulfilled, the conveyance will be enforced by the proper court.

It is the primary rule in the construction of contracts, to ascertain and carry out the intention of the parties. The certificate issued, and the constitution and statute form the contract. The certificate and the statute, leave no doubt that the parties regarded the transaction as one of sale. They never could have used such language, had not the idea of sale been the all engrossing one. The legislature thought they were making provision for the sale of the lands as the constitution commanded them, and there is no doubt, that they supposed, by withholding the title until full payment, by the 19th section, they were accomplishing precisely the same thing as though they had conveyed the title, and taken back a mortgage. In the one case, the title is withheld by the vendor as security for the balance of the purchase money; in the other, the title is conveyed, and retaken by way of mortgage for the same object. It is not difficult, but it is every day practice for a court of equity to carry into effect such contracts according to the intention of the parties. Why not do so in this case? I can perceive no valid objection.

It is one of the most common functions of a court of equity to decree and compel the execution of proper conveyances, when the stipulations of a sale have been complied with.

In this case, the complainant or his assignor thought himself a purchaser, the vendor (the state) called him a purchaser, gave him possession, he paid down the part of the purchase money required. Without any constitutional provision, specific performance of the contract of sale could be enforced. Without any constitutional provision, the state would have an equitable lien upon the land, for the balance of the purchase money, but the effect of such provision is to create this relation, independent, and in defiance of statutory enactments, and to secure the rights of the respective parties in this relation.

It is asked whether the constitution prohibits the legislature from disposing of, or using the school lands in any other manner than that therein prescribed. I answer, certainly not. The

legislature may lease them, or use them in other modes. But the constitution does require of the legislature to make provision for the sale of these lands, and it commands, that if sold on credit, the balance of the purchase money not paid down, shall be secured by mortgage on the land sold. And this plain, positive injunction of that instrument ought not to be evaded by a mere change of forms or names. It seems to me to be too clear to admit of further argument or illustration.

And there was wisdom in such constitutional provision. Had the legislature adhered to it, there could not possibly have been any fictitious issue or abstraction of certificates, there could have been no withholding of lands from sale, but in the manner prescribed by valid law. The record would necessarily show, from time to time, and day to day, the precise quantity and tracts sold, and the rights of all parties would be secured. Mistakes might occur under this as under any possible system, but they would be necessarily unfrequent, easily and early corrected, with little inconvenience, and no loss either to the state or the purchasers. But allow this wise provision of the constitution to be frittered away, or evaded by mere subterfuges, forms, or technical terms, such as contracts for sale, agreements to sell at a future day, certificates that such and such persons had agreed to purchase, or would agree to purchase hereafter, and the door is opened to every scheme of fraud and mal-administration that can be conceived. Adhere to the constitution, and the lands and the fund are safe, but depart from it, evade it, or disobey it, and all may be lost. Much more might be said concerning the imperative necessity of adhering most strenuously to the constitution in this respect, and of exacting implicit obedience to its mandate, but enough has already been said to justify me in insisting upon its strict application.

I have not the slightest doubt but that the transaction under the statute is in legal effect a sale, and that the certificate is evidence thereof, and that the state becomes thereby an equitable (perhaps in view of the constitution a legal) mortgagee of the lands sold for the balance of the purchase money, and that the purchaser becomes thereby a mortgagor, and entitled to all the

rights of such, and among them the right of redemption until legally foreclosed.

It has been said that to convey the lands on sale, and take a mortgage for the unpaid purchase money, is impracticable. How so? The conveyance or patent may be in few words, as well as the mortgage, furnished in blank, and the labor of issuing them can be but little more than that of the certificates used. But even if the labor were more, the constitution is imperative, and must be obeyed, although it may require a little more work. All attempts to evade or escape from the injunctions of the constitution, in this as well as all other departments, must inevitably result in confusion, if not disaster.