Gough vs. Dorsey.

---

GOUGH VS. DORSEY.

(1, 3, 4.) PURCHASE OF STATE LAND *at private sale; priorities in right; necessity of written application.*
(4–6.) CONSTITUTIONAL LAW: *Judicial power of school land commissioners to declare sales void.* R. S. ch. 28, sec. 121.
(7.) EQUITY—EJECTMENT: *Equitable rights of defendant in ejectment, enforced by judgment.*
(8.) SPECIFIC PERFORMANCE—STATUTE OF FRAUDS: *Oral agreement to surrender equitable claims to land.—Mistake of fact, etc.*

1. The written application required (by sec. 35, ch. 28, R. S.) to be made to the secretary of state by one desiring to purchase state lands at private sale, is indispensable to the validity of the purchaser's title as against one who subsequently purchases the land upon such an application. *State v. Janssen*, 2 Wis. 423, and *Mariner v. Gray*, 4 Wis. 380, followed.
2. The presumption that public officers have done their duty, is not sufficient in such a case to overcome the effect of clear proof, showing (1) the mode in which business of this kind is transacted in the state offices, and (2) that no evidence of such an application was found on the files or books of the proper offices at the time when the subsequent purchaser's application was made.
3. Depositing an application and the purchase money with the state treasurer, gave no right to the land until the application was filed with the secretary of state, and approved by him, and the money actually paid into the treasury.
4. Plaintiff's application for certain land, with the required percentage of the purchase money, deposited with the state treasurer, was retained by him until the lien of a tax deed upon the land should be removed, and a mortgage to secure the balance of the purchase money should be made by plaintiff and approved by the attorney-general. Meanwhile defendant made a regular application for the land for all cash, which was accepted, the money paid and receipt given. *Held*, that defendant acquired an equitable title, and that the subsequent cancellation of the sale by the commissioners, in plaintiff's favor, was invalid.
5. Under our state constitution the legislature cannot vest in any officer or body, other than the courts therein provided for, any *judicial* powers to be finally and exclusively exercised by such officer or body.

6. Sec. 121, ch. 28, R. S. *held* valid, on the ground that the decision of the commissioners therein provided for (holding a sale to be void, and requiring the purchaser to surrender his certificate) is not final, but subject to review by the courts of the state, and also on the ground of long and uninterrupted acquiescence in its validity by all departments of the state government, and by the people.

7. Defendant having alleged and shown the above mentioned facts in this action (which was ejectment), was entitled to a judgment that plaintiff (who had obtained a patent from the state) convey the land to him, upon his paying plaintiff the purchase money, and such sums as plaintiff had lawfully expended for or upon the land, for taxes or otherwise, with interest.

8. The court will not enforce an alleged agreement by which defendant was to surrender the land upon plaintiff's paying him a certain sum: (1.) Because the minds of the parties do not seem to have met as to the *place* of payment. (2.) Because the defendant seems to have acted under a misapprehension of the facts which had occurred at the land office. (3.) Because, being an executory agreement to release defendant's equitable interest in land, and not being in writing, it was void by the statute of frauds.

APPEAL from the Circuit Court for *Brown* County. Ejectment, for 120 acres of land. The answer set up certain facts to show that plaintiff had obtained a patent of the land from the School Land Commissioners, but that defendant had previously made a valid purchase of the land from said commissioners, which they had subsequently attempted, without authority, to cancel; and it demanded judgment that the plaintiff release and convey to defendant all claim to said land, etc. Reply in denial, and alleging an agreement by defendant to surrender possession of the land upon payment to him of a certain sum of money, which was thereafter tendered to but refused by him.

The facts shown by the evidence were substantially as follows: About the 16th of May, 1864, the plaintiff took to the office of one Vail, a private banker in Port Washington, Ozaukee county, an application to purchase from the state the lands in question, being one of the printed blank forms prepared for that purpose by the school land commissioners, having the blanks filled out, and ready for signature. This paper plaintiff signed in the presence of Mr. Vail, and paid the

latter $151.22, being the amount required to be paid in cash. On the same day Mr. Vail, as plaintiff's agent, sent the application and money to the Hon. Samuel D. Hastings, who was then the state treasurer. A few days later he received a letter, dated "Office of Commissioners of School and University Lands, Madison, May 18, 1864," and signed, "Samuel D. Hastings, State Treasurer," and enclosing a "set of loan papers for *Mr. Gough* to execute and return." These papers were a "school fund note" for $200, running to the state of Wisconsin, for a loan of that amount from the school fund; a "school fund mortgage" upon certain lands of the plaintiff, to secure said note; and a receipt, running to the state treasurer, for said $200. The $200 referred to in these instruments was the balance of the price of the premises, after making the above mentioned cash payment. The plaintiff executed these instruments, and acknowledged the execution of the mortgage, in due form, under date June 3, 1864, and they were forwarded by Mr. Vail the next day to Mr. Hastings. At the instance of the latter, and at plaintiff's request, Mr. Vail also sent a blank form to the treasurer of Brown county (in which the lands lie), requesting him to certify in regard to any taxes with which the lands might be charged, and therewith he sent also the treasurer's fees. After considerable delay, but, it would seem, before the 25th of said month of June, Mr. Vail received an answer from said county treasurer, declining to give the certificate required, unless the application therefor should come from the commissioners. It seems, however, that a tax deed had been issued for the land June 2d, 1864, for taxes of 1860; and this fact was stated to Mr. Hastings, the state treasurer, in a letter from Mr. Vail under date June 25, 1864.

As to what occurred subsequently, Mr. McBride, a clerk in the school land office, testifies as follows: "On the 27th day of July, 1864, *Patrick Dorsey* made

Wis. xxvii—16

application to the secretary of state and presented the same to me to purchase that land, and, the books in the land office showing it to be vacant and subject to sale, I made him a receipt for the full amount due the state thereon, for principal, interest and taxes, amounting in all to three hundred and forty-one dollars and fifty-nine cents. I handed the receipt to *Mr. Dorsey.* I examined the sales book, where we kept the record of the land for sale, that had been forfeited to the state, and found no entry of any sale of this land there, and no evidence of its having been previously applied for. Had any sale been made, it should and would have been entered there. I, as clerk of the school land office, had, in conjunction with other clerks, the control of said sale books, and the making of receipts for the sale of lands and the payment of interest is my especial duty in the office, and more so than that of any other clerk." *Question:* "What is the rule for proceeding to effect the entry of land?" *Answer:* "It is to make application to the secretary of state in writing, giving a description of the lands applied for, and signing such application in the name of the party in whose name application for entry of the land is made. That application is presented at the land office; if the land is subject to sale, a receipt in blank is made, giving the amount by items, which is required to be paid down. That receipt is given to the party applying, who takes it to the state treasurer, where the money is paid and the receipt is signed by the state treasurer and countersigned by the secretary of state. Attached to said receipt are the stubs, so called, which are abstracts of the receipt, one of which is retained by the treasurer at the time of receiving the money. The other, a duplicate, is signed by the recording clerk in the state treasurer's office, then passed into the office of the secretary of state; is entered in his books and then returned to the land office, and patents or certificates, as the case may be, are then made to be given

to parties on the surrender of the original receipt. No application on behalf of *Gough*, the plaintiff, to the secretary of state, for the purchase of said land, had been sent into our office for receipt, to my knowledge, prior to the sale to *Dorsey*. If any had been made, I think I would have known it. At the time of the sale to *Dorsey*, there was no entry of any such application for a receipt or for entry on any of the books in our office. On or about the 19th day of August following, an application of *Michael Gough* for said land, together with an order by the commissioners of school and university lands, was presented to me from the state treasurer's office. Said application was dated June 3d, 1864. The commissioners' order recalled the sale of the land to *Patrick Dorsey*. I made a sale receipt for *Gough*, dating the same June 3d, 1864, in accordance with instructions received from the treasurer's office. (That order is in the possession of J. A. Bate, clerk of the commissioners.) The application by *Gough*, on the 19th of August, was the first presentation of the application at our office, according to the best of my knowledge and belief. On or about the 29th of September, 1864, *Dorsey* returned his full paid receipt to the state treasurer for a patent. In compliance with the commissioners' orders, his money was refunded, and the patent not issued, and the application made by *Dorsey* is on file in the school land office. I am unable to find the application made by *Gough*. It is not in its proper place in the files."

The application of the defendant, the receipt given him, the order of the commissioners vacating the sale to him, and the patent issued to the plaintiff on the 19th of August, 1864, were all put in evidence. Mr. Purple, who was assistant state treasurer in 1864, testified, from the books of the office, that " on the 27th of July, 1864, *Patrick Dorsey* paid into the state treasury $341.59, to enter the lands in question; that on the 27th of August, 1864, $341.59, and one dollar as

patent fee, were paid in the state treasury by or for *Michael Gough,* to enter the same land." As to the mode in which this payment was made, Mr. Purple testifies: " James W. Vail    *    *    *    had an account of [on] the deposit journal with the state treasurer during the year 1864. The nature of this account was as follows: Remittances were made on the part of Vail to cover applications (in favor of himself or other parties) for payment of interest and entry of state lands. It frequently happened that his remittances exceeded the amount necessary to be used in payment on present applications, leaving a surplus on hand to his credit. Against this surplus he frequently ordered payments to be made on applications for the payment of which no special remittance had been received. I notice the following balances to his credit: June 3, 1864, $603.01; July 27, 1864, $191.95; August 19, 1864, $635.10. The deposit journal is not regarded as one of the official books of the office. The law requires the secretary of state to make an examination of the state treasury quarterly, and report the amount of moneys on hand at each examination; the amounts on deposit for the payment of land, interest charges, etc., are not by him taken into the account. The balances of Mr. Vail noticed above were not included in the amounts in the treasury as certified by the secretary of state for the quarter in which they occurred. On parties applying for lands or to pay interest to the state, by letter, the amount of each remittance is entered to their credit in the deposit journal, and application forwarded to the land office for receipts or entries, and when they are returned to the treasurer's office, the money is then paid into the treasury and charged to the parties on the deposit journal.    *    *   I do not find in the deposit journal any entry of any special remittance by Vail to cover the plaintiff's application to enter the land aforesaid, until the August entry, in relation to which I have testified. If any

direction was given, it was to pay the same out of the balance in his favor."

It appears further, that the defendant accepted the money refunded to him by the order of the school land commissioners, and that subsequently he agreed with the plaintiff to surrender possession of the land to him in fifteen days after said agreement; upon payment by the plaintiff to him of $26; but that he never received the money (whether through his own negligence or the default of plaintiff, the evidence is contradictory). It appears further, however, that when he accepted said money and entered into said agreement, he was in ignorance of the reason which had induced the commissioners to vacate the entry of the land by him.

The court held that the school land commissioners had the right, and it was their duty, to cancel the entry to the defendant, return his money, and issue the patent to the plaintiff; and that defendant was not entitled to the relief demanded in his answer. A judgment was entered accordingly.

Afterwards, upon a trial of the issue at law, a verdict was found and judgment entered in favor of the plaintiff.

From both these judgments the defendant appealed.

*Ellis, Hastings & Greene*, for the appellant, contended that sec. 121, ch. 28, R. S. (under which it is claimed that the order cancelling the sale to *Dorsey* was made), does not purport to give the commissioners power to hear and determine cases of this kind; that the question of mistake, illegality or fraud in a sale of land is one for judicial decision, and the power to make such a decision cannot, under our constitution, be vested in such officers (Cons. of Wis. Art. 7, sec. 2; *Att'y Gen'l v. McDonald*, 3 Wis. 805; *Wells v. Morton*, 10 id. 468; *Stone v. Elkins*, 24 Cal. 125; *Sanborn v. Rice County*, 9 Minn. 273; 24 U. S. Dig. 127; 25 id. 104); that *Gough* had not in fact purchased the land prior to the sale to

*Dorsey*, because he had not presented to the secretary of state a written application for such purchase, nor paid into the state treasury the purchase money, and complied with other conditions imposed by law (R. S. ch. 28, secs. 35–38; *State v. Janssen*, 2 Wis. 423; *Mariner v. Gray*, 4 id. 383; *McIndoe v. Jones*, 6 id. 334); that by paying the money and complying with all the conditions of sale, *Dorsey* gained a vested right, and the certificate given him by the treasurer constituted a contract between him and the state, and he became the equitable owner of the land. *Smith v. Mariner*, 5 Wis. 551; *Smith v. Clark*, 7 id. 551; *Whitney v. State Bank*, id. 620.

*John C. Neville*, for the respondent, contended that *Dorsey* obtained no rights as against the state under his certificate, in case the sale to him was made by mistake or not in accordance with law, or was obtained by fraud (R. S. ch. 28, sec. 121; *Lawton v. Howe*, 14 Wis. 250); that the evidence shows an application, and money for the cash payment required, forwarded to the state treasurer by *Gough* early in June, 1864; that the evidence of Mr. Purple shows that it was customary in such cases for the state treasurer to forward the application to the land office, and it must be presumed that this was done in the present case, although the evidence of it has been lost, or no proper record of it was made; that the commissioners having investigated the subject and found that *Gough* had perfected his purchase in June, and having cancelled the sale to *Dorsey* on that ground, it must be presumed that they performed their duty correctly; that payment of the money to a public officer who had authority to receive the same, to be paid into the state treasury, was in legal effect a payment into the treasury; that the neglect of the officers or clerks of the land office to make proper entries of *Gough's* application was no reason why he should lose his land (*State v. Commissioners*, 14 Wis. 348); that the duties

of the school land commissioners are not merely ministerial, but they also exercise judicial functions, deciding upon the evidence before them; and that when power or jurisdiction are delegated to any public officer or tribunal over any subject-matter, and its exercise is confided to his or their discretion, the acts so done or conclusions arrived at are binding, and individual rights will not be disturbed *collaterally* for anything done in the exercise of that discretion, unless in case of *fraud* in the party. *Lamont v. Stimson,* 3 Wis. 554; *Abbott v. Bahr,* 3 Chand. 210; 14 Wis. 250, 345; *State of Michigan v. Phœnix Bank,* 4 Bosw. 363; *Orton v. Commissioners,* 17 Wis. 248.

DIXON, C. J. The turning point in this case, and fatal objection to the plaintiff's title, as it appears to us, is the want of the written application required by law to be produced to the secretary of state by every purchaser at private sale of any school or university lands. R. S. ch. 28, § 35. This is the first step in procuring such title, and the foundation of it, wherever the rights of third parties intervene. It is indispensable to its validity, as has more than once been decided by this court. *State v. Janssen,* 2 Wis. 423; *Mariner v. Gray,* 4 Wis. 380. The proof is very clear and positive that no application in writing by the plaintiff ever came to the hands of the secretary, or to the proper office, according to the mode in which the business was transacted, until after the defendant had made and presented his written application, and entered and paid for the land in due form of law. It is needless to dwell upon the testimony to this point, as it is too clear and indisputable to admit of any reasonable doubt. The learned counsel for the plaintiff does not question it, except upon the ground that the application may have been mislaid or lost, and the proper entry upon the books accidentally omitted. This is a very unsatisfactory explanation, and, con-

sidering the course of business through the different offices, as shown by the principal witness, cannot be credited.   If the application had been made, it is very improbable that it should have been lost, and that there should have existed no evidence of it in the school land office at the time of purchase by the defendant, as testified by McBride.

And the effect of this testimony is not encountered or overcome by the presumption in favor of the correctness of official action, as argued by counsel.   In the absence of all proof to the contrary, the correctness of the action of the. commissioners in cancelling the entry of the defendant and allowing that of the plaintiff, may well be presumed.   On the other hand, if previous application had been duly made by the plaintiff, accompanied by the requisite payment of purchase money, the presumption is equally strong that it would have been shown by proper entries in the books; and so, too, is the presumption that the application itself would have been found in the proper place, subject of course to the accident of being occasionally lost or mislaid.   The presumption, therefore, affords no aid to the plaintiff; and, besides, it is to be resorted to only where the proofs are doubtful, or in the absence of proof.   The question must be decided upon the evidence, as it appears without the presumption.   The truth seems obvious that no application by the plaintiff was presented to the secretary of state until long after the land was entered by the defendant. The application forwarded by Vail, as he testifies, on the 16th of May, to the state treasurer, was no doubt retained by the treasurer or by his "deposit clerk" until the plaintiff came to Madison shortly before the 19th of August, when the order was made by the commissioners setting aside the sale made to the defendant.

And this view is in harmony with the entire testimony.   The money of Mr. Vail, the plaintiff's agent to enter the land, deposited with Mr. Hastings, at that

time the treasurer of the state, was not in the state treasury. It was in the hands of Mr. Hastings as a mere private individual, who, for the convenience of parties transacting business with the school land department, thus consented to act as their agent. It was the same as if any other person at the capitol had undertaken to receive and pay money into the treasury and to present written applications for parties residing in distant parts of the state. The deposit of money with such person, or the receipt of any application by him, would have availed nothing as an entry or purchase of land. No more did they with Mr. Hastings. So long as he retained the application, the land was unapplied for, and was subject to entry by any other person. And the fact that he retained the application is most strongly corroborated by the fact that no money was paid into the state treasury on the plaintiff's purchase until the 27th of August, one month after the defendant had bought and paid for the land. And this alone is sufficient to invalidate the plaintiff's claim, even though his application had been first filed in the proper office. Application without payment gives no vested right, and it still would have been competent for the defendant to apply for and purchase in the manner he did. *McIndoe v. Jones*, 6 Wis. 334; *Mariner v. Gray, supra.* And see *Smith v. Mariner*, 5 Wis. 551; *Smith v. Clark*, 7 id. 551; and *Whitney v. State Bank*, id. 620. His relations with such depositors, and duties as treasurer, were no doubt well understood by Mr. Hastings, and it would have been somewhat strange had it been found that the application was filed in the secretary's office and an entry or sale in form made, and yet no charge or credit of the money upon his own proper books as treasurer. No treasurer would be likely to do business in that way. He would do as the evidence shows Mr. Hastings did, retain the application and the money on deposit until the note and mortgage were properly executed, the

lien or incumbrance by tax deed removed, and all things ready to consummate the sale. And these, it seems, occupied considerable time in the performance; for it was not until the 24th of August that the mortgage was approved by the attorney-general. But in the meantime the defendant's application to purchase for all cash down was received. In that case the tax deed constituted no obstruction. It was for him to redeem after the purchase, and there was to be no delay for the execution and recording of a mortgage. His application was accepted, the money paid into the treasury, and a receipt executed, thus giving him complete equitable title to the land, unless it was still competent for the commissioners to set aside the sale to him and allow the entry by the plaintiff, as was subsequently attempted to be done—which is the next question to be considered.

This question as to the power of the commissioners to vacate sales and set aside or annul certificates of entry, depends upon the true meaning and construction of sec. 121 of said chapter 28, which reads as follows: "In case of the sale of any school or university lands made by mistake, or not in accordance with law, or obtained by fraud, such sale shall be void; and no certificate of purchase issued thereon shall be of any effect; but the holder of any such certificate shall be required to surrender the same to the commissioners, who shall thereupon refund the amount paid for the land described in such certificate."

It is urged that this statute confers judicial powers upon the commissioners, without benefit of appeal or review in the courts, and that their action in declaring the sale void, is final. It is to be observed, with respect to the language, that it does not expressly confer upon the commissioners any power or authority to hear and determine the causes for which it is declared the sale shall be void. It is merely enacted that for certain causes, if made by mistake, or not in accordance

with law, or obtained by fraud, the sale shall be void; but how, or by what officers or tribunal those causes shall be examined and decided, the statute does not say. The questions involved are purely of a judicial character, and the inference may be most reasonable that only a judicial investigation or trial was intended. There is nothing in the language directly, or hardly indirectly, opposed to such an interpretation; and if it were the only alternative, thus to construe it or to hold that the commissioners are invested with full judicial powers and made the final and exclusive arbiters in such cases, we should have no hesitation in saying that the former construction must prevail. It would prevail on constitutional grounds, if on no other. It is obviously incompetent for the legislature to vest judicial powers of the kind, to be finally and exclusively exercised by any officer or body of officers, except by the courts of law or equity organized under the constitution and in the manner therein prescribed. Every construction in conflict with that instrument must be rejected, and a statute incapable of harmonious exposition with it, must fall. But the rule is, that statutes should be so construed as, if possible, to stand. There is but one way of construing this statute consistently with the supposed delegation of power to the commissioners, and so that it may stand, and that is by holding that the action of the commissioners is always subject to examination and review in the courts. As already observed, the power of the commissioners to set aside sales for the causes named, is not expressly conferred. Its existence is implied from the last clause of the section, by which the holder of any such certificate is required to surrender the same to the commissioners, who shall thereupon refund the amount paid for the land described in the certificate. It is not inconsistent with the words of the statute that this order or requirement should follow a judicial sentence or decree annulling the sale; and yet it is by

no means certain that it was not the intention to authorize the commissioners in the first instance to declare the sale void. I have some difficulty in holding that even this power may be given them; but such has been the practical construction which the statute has received, and its invalidity may not, after all, be so clear. Long usage under a statute is entitled to very great weight in its interpretation, and ought not, perhaps, to be overlooked when it is examined in a constitutional point of view. The exercise of a summary jurisdiction of the kind by the commissioners may be often very useful, and, subject to review and correction in the courts, the objection to it does not seem insuperable. The process of judicial investigation, while it has the advantage of greater care and deliberation, and consequently of greater certainty in attaining correct results, has also the disadvantage of many times being very slow. In the very numerous transactions of the school land office, cases may not be unfrequent where delay would be most injurious. The cases may be plain ones, and prompt determination required. They may be such that no judicial examination will be advised or sought, but the decision of the commissioners accepted as correct. In such cases the benefits of the summary mode of proceeding are manifest, and the evils disappear when it is known that the judicial remedy is open to any person feeling himself aggrieved by the action of the commissioners. And the giving of such power is in harmony with what has been the general practice of our government, both state and national, in this respect. The officers intrusted with the sale and disposition of the public lands have always been invested with certain limited judicial powers of the kind, closely connected with the duties they are required to perform, and which seem necessary to a proper performance of them. They have been authorized to vacate entries of land under similar circumstances, and to issue certificates to other

applicants. They have been empowered to hear and decide questions of contested rights of preëmption or entry, which are quite judicial in their nature, and often present points of much difficulty and importance. In some instances an appeal has been given directly from their decision to the courts, as was done by a law of this state giving an appeal from the decisions of the register of the state land office for the sale of the lands granted to the state to aid in the improvement of the Fox and Wisconsin rivers. *Veeder v. Guppy*, 3 Wis. 502. And in all cases it has been held, we believe, where no appeal is directly given, that the proceedings of such officers, so far as they act judicially, are subject to review and correction in any proper action instituted between the parties in interest.

And so we must hold in this case, that the order of the commissioners vacating the sale to the defendant is subject to be reviewed under the answer of the defendant, which is in the nature of a cross bill or equitable action, instituted by him to enforce his title or claim in equity to the land. And this jurisdiction of the court being established, the conclusion favorable to the title or claim of the defendant follows from what has been previously said. There was neither fraud, mistake, nor a non-compliance with law in the sale, and the action of the commissioners was unauthorized. The court below should have so found upon the trial of the equitable issue, and should have directed a conveyance by the plaintiff to the defendant, upon payment to him by the latter of the purchase money and the interest, together with such sums as may have been paid by the plaintiff for taxes, or otherwise lawfully expended, with interest on the same. This will make the plaintiff whole, and restore to the defendant that of which he was unlawfully deprived by the order of the commissioners made at the instance of the plaintiff.

There are some other facts in the case, but they

are not such as to vary this conclusion.    The alleged agreement between the plaintiff and defendant, by which the latter was to surrender possession of the land, was never executed on the part of the plaintiff, at least as it was understood by the defendant.    It is doubtful whether the agreement was of any validity by reason of the misunderstanding of the parties. Their minds seem not to have met as to the place of payment.    But a still more serious objection to it is the statute of frauds.    To have been valid as an executory agreement to release the defendant's equitable title or interest, it should have been in writing and subscribed by him.    And more than this, the agreement was entered into by the defendant under a misapprehension of facts.    He was ignorant of what had transpired at the land office, or of the circumstances under which the sale to him had been set aside.    That proceeding was *ex parte*, and he did not learn the facts until after this action was commenced, and would probably be entitled to relief on that ground.

On the whole, we are of opinion that the judgments appealed from, both that upon the equitable issue, which was first tried, and that upon the issue at law, must be reversed, and the cause remanded with directions to enter judgment in favor of the defendant for the relief demanded in his supplemental answer, the sums expended by the plaintiff, and which the defendant offers to pay, being first ascertained in accordance with the rules above stated.

*By the Court.*—So ordered.