Wisconsin Industrial School for Girls, Appellant, vs. Clark County, Respondent.

*May 16 — September 26, 1899.*

*Industrial school corporations: Maintenance of children committed thereto: Counties: Construction of statutes: Constitutional law: Power of judges at chambers: Commitment of children to industrial schools: Liberty of person: Trial by jury: Taxation: Public service.*

1. The expense of maintaining children, committed under secs. 1546, 1547, R. S. 1878, to industrial school corporations, is chargeable to the counties from which the commitments are made unless otherwise specified therein.

2. When a statute is open to judicial construction the court should look to the whole and every part of the law, to the intent apparent therefrom, the subject matter, the effect and consequences, and the apparent reason thereof, and then give effect to the idea in the

Wisconsin Industrial School for Girls vs. Clark County.

legislative mind in its enactment if that can reasonably be discovered and spelled out of the words they used to express it, though it violates the literal sense of such words.

3. The legislative will attempted to be expressed in a statute, though determinable only by judicial construction, when so determined is as much a part of the law as if it were literally expressed.

4. The constitutional provision, sec. 2, art. VII, vesting the judicial power of the state in courts, does not deprive judges of such courts from exercising such powers at chambers as were customarily exercised before the constitution, or any other power of a judicial nature authorized by the legislature, not requiring a trial of an issue of fact.

5. The commitment of a child to an industrial school corporation, not as a punishment for crime but to furnish the child needed guardianship, maintenance, and care for its benefit and that of society, is not an interference with personal liberty requiring a trial by jury to justify it.

6. The taxing power of the state cannot be used to furnish a gratuity to a person or corporation engaged in a private enterprise, though it be one in which many persons are interested; but it may be used to compensate such person or corporation for a public service.

7. The test of whether an agency may be used by the state, or particular political subdivision thereof, by legislative authority, to perform service at public expense, is not whether the agency is private, but whether the service is within governmental functions. If the purpose of the employment be public and constitutional, and the agency be an appropriate means to accomplish such purpose, and not prohibited by state or national constitution, it is, under reasonable regulations, constitutional.

8. Where a child, by reason of poverty or other cause, stands in need of proper parental care and maintenance, it is a legitimate governmental function to furnish the necessary relief; and the employment of a private corporation, organized specially to care for children in such situations, is the use of an appropriate means to perform the duty of the state, and is constitutional.

[Syllabus by MARSHALL, J.]

APPEAL from an order of the circuit court for Clark county: JAMES O'NEILL, Circuit Judge. *Reversed.*

According to the complaint, plaintiff, during the times mentioned therein, was an industrial school corporation organized under the laws of this state. Certain vicious, aban-

doned, incorrigible, and vagrant children, specified, were duly committed to its custody and care by the county judge of the defendant county, and such county, by reason thereof and of the services rendered by plaintiff in the care and maintenance of such children from November, 1894, to November, 1897, inclusive, became indebted to plaintiff in the sum of $1,968.64. No contract was made with the county for the maintenance of such children, but for the years prior to 1894 it customarily paid plaintiff, without objection, $2.50 per week for each such child; and the care and maintenance from November, 1894, to November, 1897, inclusive, was reasonably worth that price per week. There were further allegations that plaintiff properly filed its claim with the county clerk for the indebtedness mentioned, for consideration and allowance by the county board. The claim was disallowed by such board. Plaintiff took an appeal to the circuit court in due form of law and there made a formal complaint pursuant to the court's order. When the matter first came on for hearing in the circuit court, plaintiff's complaint consisted of its claim as filed with the county clerk, to which defendant had filed a general demurrer. The issue thus formed was decided in plaintiff's favor, with leave to the defendant to answer on the usual terms within ten days after service of a formal complaint. A complaint was served in due time, to which defendant demurred generally. The issue thus formed was heard without objection and decided in defendant's favor. The appeal is from the order accordingly entered.

For the appellant there were briefs by *E. E. Chapin*, attorney, and *MacBride & MacBride*, of counsel, and oral argument by *Mr. Chapin* and *Mr. R. J. MacBride*.

For the respondent there was a brief by *S. M. Marsh*, district attorney, and *Geo. L. Jacques*, of counsel, and oral argument by *Mr. Jacques*. They contended, *inter alia*, that when, in the revision of an act, portions of the original act are

retained and portions omitted, those omitted are deemed to be annulled and repealed, and cannot be revived by construction. *Sengpeil v. Spang,* 47 Wis. 28; *Bogie v. Waupun,* 75 Wis. 1; *Abraham v. Agnew,* 83 Wis. 246; *Rottsoll v. Two Rivers Mfg. Co.* 96 Wis. 324; *Evans v. Curtiss,* 98 Wis. 97; *Smith v. Eau Claire,* 78 Wis. 457; *Goodno v. Oshkosh,* 31 Wis. 127. If a statute creates a liability when otherwise none would exist, it must be strictly construed. Sutherland, Stat. Const. 371; *Steamboat Ohio v. Stunt,* 10 Ohio St. 582; *Moyer v. Pa. S. Co.* 71 Pa. St. 293; *Lane's Appeal,* 105 Pa. St. 49; *O'Reilly v. Bard,* 105 Pa. St. 569; *Matter of Hollister Bank,* 27 N. Y. 393.

The following opinion was filed June 2, 1899:

Marshall, J. The following propositions are urged in support of the order appealed from, either one of which, if sound, is fatal to plaintiff's cause of action: (1) The expense of care and maintenance of children committed to industrial schools of this state by county judges under sec. 1547, R. S. 1878, and received, cared for, and maintained accordingly under sec. 1786, R. S. 1878, is not by statute imposed on the counties from which the children are committed. (2) The statute purporting to confer on judges of courts of record authority to commit children to industrial schools contravenes the constitutional provision vesting all judicial power in certain specified courts created by legislative enactment pursuant thereto, and contravenes the constitutional guaranty of trial by jury. (3) The duty of maintaining dependent children, so far as assumed and exercised as a function of government, cannot be delegated to a private corporation to be performed at public expense. (4) Children not paupers or restrained of their liberty as punishment for crime cannot be maintained at public expense by a private corporation. We will consider each of such propositions.

1. There is no county liability in the circumstances stated

in the first proposition unless there is a statute expressly or by necessary implication creating it. To determine whether such a statute exists, at the outset recourse must be had to the first legislation on the general subject of caring for children in state industrial schools, and a comparison of it with the law on such subject as it now exists.

Following precedents in other states dating at least as early as 1826 (*Ex parte Crouse*, 4 Whart. 9), the legislature of this state enacted ch. 325, Laws of 1875, providing for the organization of industrial schools for the care, guardianship, education, and training of such boys and girls as should be committed to their custody for that purpose under its provisions. In order to insure the beneficent object of the law it was provided that each organization should be composed in whole or in part of ladies not less than twenty years of age. The law contemplated the organization of corporations without capital stock, for purely charitable purposes, without income other than to pay the expenses of the work to be conducted. The only requisite to membership was that an applicant therefor should be a contributor to the expense of the corporation in the manner provided for in the by-laws. No provision was made for distribution of profits, as there was to be no such feature as profits to members. The object was to enable several persons to unite and act as one in caring for and maintaining such boys and girls as might stand in need of such services for the reasons mentioned in the law. Any judge of a court of record, among other officers, was authorized to cause to be brought before him any male child under the age of twelve years, or any female child under the age of sixteen years, found begging or receiving alms, or in a public street for that purpose, or found wandering without a home or settled abiding place, proper guardianship, or means of subsistence, or found destitute, either by means of being an orphan or having a parent or parents undergoing imprisonment, or frequenting the com-

Wisconsin Industrial School for Girls vs. Clark County.

pany of reputed thieves or lewd, wanton, or lascivious per-
sons, or notorious resorts of bad characters, or found wan-
dering in streets, alleys, or public places, belonging to the
class of children called "rag-pickers," or an inmate of a house
of ill fame or poor house, whether in common with its par-
ent or parents or otherwise, or abandoned in any way by
parents or guardian, or without means of subsistence or sup-
port.    Having brought any child of the description men-
tioned before him, the judge was authorized, upon being sat-
isfied that the welfare of such child would be promoted
thereby, to order it sent to an industrial school organized
under the act, to be kept and maintained at the expense of
the county until it arrived at the age of twenty-one years, or
was sooner discharged as provided in the act; and it was
expressly provided that a child so placed should be there
maintained at the expense of the county.    The act further
provided for the reception, care, and maintenance of any
child belonging to either of the classes mentioned, when so
placed in an industrial school by its parents or guardian, or
committed to such school by a judge of a court of record
of the county upon complaint of its parents, guardian, or, if
none, those having it in charge, because of their inability to
control the child and desire to have it sent to an industrial
school, upon due proof that the welfare of the child would
be promoted thereby.    There were further provisions in re-
gard to the commitment of children to industrial schools
upon their conviction of crime punishable by imprisonment.
Secs. 5 and 6 of the law contained all of the act relating to
the manner of placing children in the schools and their main-
tenance by the corporations at public expense.    Other parts
of the act related to the organic and administrative features
of the corporations.

    The plaintiff was organized under such act, for the care
of infant girls, and for more than twenty years prior to the
commencement of this action, pursuant to judicial commit-

ments made from time to time, has received into its cus-
tody girls of authorized classes, and cared for, maintained,
and educated them, charging the expenses thereof to the
counties from which they were received and collecting the
same without question of their validity so far as appears,
except in the instance now brought to the attention of the
court and the instance where the right was questioned in
*Milwaukee Industrial School v. Milwaukee Co.* 40 Wis. 328,
and the liability of the county was sustained by a decision
that has been supposed to govern the subject till it was dis-
covered in this case that the express language of the law of
1875, as to maintenance of children at the expense of the
counties from which committed, was not literally preserved
in the revision of 1878. By such revision the law of 1875
was superseded by provisions supposed by the revisers, and
by the legislature, to contain all its essential features. That
part of secs. 5 and 6 relating to the commitment to indus-
trial schools, by the court, of children found guilty on com-
plaint and conviction of an offense within the scope of
the act, was embodied in sec. 1546, and the balance was
embodied in sec. 1547. Such is the statement made by
the revisers in their notes which were placed before the leg-
islature with their work. The report of the committee that
considered such work does not show that any change therein
was made affecting the subject under discussion. A com-
parison of sec 1547 with sec. 5 of the law of 1875 shows that
the latter was copied into the former with substantial ac-
curacy, except the language expressly imposing upon coun-
ties the expense of maintaining children at the industrial
schools was omitted, and the right to commit was limited
to judicial officers or courts having jurisdiction throughout
the county. There were some additions made, among them
a provision giving the right of appeal from the action of
the committing judge or court, to the circuit court, as in
case of appeal from a criminal conviction by a justice of the

peace; and a provision to the effect that if a commitment be made on petition of the parent, guardian, or person having the child in charge, the judge may, in his discretion, require him to pay the whole or any part of the expense of the child's maintenance, according to his ability. The provisions of the act of 1875 so carried into the new revision, for the purpose of an orderly arrangement of the statutes were placed in the chapter relating to police regulations. Under the head of "Additional Powers of Peculiar Corporations" a section was framed and numbered 1786, supposed to embody all of the law of 1875 necessary to be retained and not contained in other portions of the statutes, so noted by the revisers, indicating clearly that they did not suppose that sec. 1786 included any of sec. 5. That is consistent with their note to sec. 1547 stating that it contains all of sec. 5 not embodied in previous sections of the revision. Sec. 1786, however, contained this language: "The corporation may contract with any parent or guardian, or the county or municipal corporation responsible therefor, for the maintenance, care, and education of every such child, or recover a reasonable price therefor if no contract be made, not exceeding what is fixed by its by-laws and regulations."

The legislative purpose to include all of sec. 5 of the law of 1875 in secs. 1546 and 1547 of the revision, rendering any additional provision as to payment of the expense of maintaining children at industrial schools unnecessary, is clear. Nevertheless, the express language on the subject, in the old law, was not preserved, but the municipal unit, the county, was made much more significant than before, as if county jurisdiction and county liability were the ruling ideas. While under the old law children could be committed by officers having no jurisdiction outside of a city,— the power being given to mayors and all officers having criminal jurisdiction,— in the revision the jurisdiction was confined to courts and officers having jurisdiction throughout the county.

No discussion is necessary to show that the statutes as they now exist, being the same as in the revision of 1878, are not so easily understood but that rules for judicial construction may be properly resorted to in determining the intent of the legislature, and from that standpoint they must be considered.

By one of the most familiar rules for statutory construction, we may and should reject any meaning that may be attributed to the statutes which would lead to an absurd or unreasonable result. It is often said that the true rule to be observed in a situation like the one before us is to look to the whole and every part of the law, to the intent apparent from the whole, to the subject matter, to the effect and consequences, to the reason and spirit, and thereby ascertain the ruling idea present in the legislative mind at the time of its enactment, and then, if the manifest purpose of the lawmakers can thereby be reasonably spelled out of the words they used to express it, to give effect to such purpose, though the meaning thus adopted be quite contrary to the literal sense of the words. *Ogden v. Glidden*, 9 Wis. 46; *Harrington v. Smith*, 28 Wis. 43; *Hartford v. N. P. R. Co.* 91 Wis. 374. When the legislative will, attempted to be expressed in a statute, is worked out in the manner indicated, it is as much a part of the law and as binding on courts as if literally expressed therein. *State ex rel. Heiden v. Ryan*, 99 Wis. 123; *People ex rel. Att'y Gen. v. Utica Ins. Co.* 15 Johns. 358; *Indianapolis & St. L. R. Co. v. Horst*, 93 U. S. 300.

Now the persons liable to be placed under guardianship under the statutes in question belong to the classes of helpless unfortunates that the state is in duty bound, through some proper agency, to protect and care for, primarily for the benefit of the children, but for the common good as well. In recognition of that duty and with intent to effectually perform it, the statutes as we find them were enacted. To say that the sections referred to, contained in the police reg-

ulations, without reference to sec. 1786, do not impose the expense of their administration on some definite political subdivision of the state, would be unreasonable. To say that the legislative intent was to leave voluntary organizations of worthy ladies, devoting their energies to promote the welfare of children, taking upon themselves one of the most important duties the state owes to its people, to bear the expense of that part of their charitable work done in response to commitments of children officially made to their care, without any provision for such expense expressed in such commitments, would convict the lawmaking power of placing upon the statute books a very absurd piece of legislation. Any such construction must be rejected, as indicated by the most familiar rules of statutory construction, if one that is reasonable can be found.

In view of the fact that all the essential features of the law of 1875, relating to the commitment of children to the guardianship of industrial schools, and those in regard to their maintenance as well, are said by the revisers to have been included in sec. 1547, and the changes eliminating from the old law all jurisdiction in making commitments but that of officers having authority co-extensive with the counties in which they act, showing clearly that the municipal unit in the legislative mind was the county, the conclusion is well-nigh irresistible that the legislative purpose was to preserve county liability for the maintenance of children sent by its courts and judicial officers to the industrial school corporations; and that such purpose, by necessary inference from the language of the statute viewed in the light of all the circumstances, is clearly found therein, notwithstanding the entire absence of express language on the subject. This, of course, relates only to commitments which contain no suggestion as to where the guardian corporation is to obtain its pay.

We have not overlooked the use of the word "municipal-

ity" in sec. 1786.  Such word is not of sufficient significance to call for such construction of secs. 1546 and 1547 as will give such word some plain literal application.  True, a construction should be adopted that will give effect to every part and word of the statutes if that can reasonably be done; but it is not reasonable to say that children committed to the care of industrial schools under the chapter on police regulations were intended to be charged according to the regulations existing in counties, towns, cities, and villages regarding the support of the poor.  The law does not require the committing magistrate to make a determination as to whether a child committed by him is a pauper and to evidence that to the receiving corporation, specifying the particular political subdivision of the state liable for the child's maintenance.  No way is pointed out in the statute whereby such corporation can determine that question.  The idea advanced that a charitable corporation adopted by the state as an agency for the performance of public functions, as to each child received, is left by the law to discover the particular subdivision of the county liable to compensate for its services, and to contest the question of liability with such subdivision, is unreasonable in the extreme.  It is out of harmony with the whole legislative scheme for the protection and care of unfortunates committed to industrial schools.  It cannot be adopted in order to find something for the word "municipality" in sec. 1786 to apply to.  It is more reasonable to hold that such word and the word "county" were used in the same sense, as they can be without violating any rule of language or of law.  A county, in legislative enactments, is often spoken of as a municipality. *Lund v. Chippewa Co.* 93 Wis. 640.

We reach the conclusions that the police regulations in regard to the commitment of children to industrial school corporations, and sec. 1786, regarding liability to pay for the maintenance of such children, are in harmony and fix

the liability upon the counties from which the children are received, in the absence of anything in the commitment to the contrary; that such is the meaning of the police regulations by necessary inference; that the same meaning is plainly expressed in sec. 1786; that the purpose of the legislature to preserve county liability the same in the present statute as under the law of 1875 is beyond reasonable controversy; and that the language of the law admits of a construction in accordance therewith, and of no other reasonable construction.

2. The next proposition is that power cannot be legitimately vested in a judge to commit children to industrial schools. On this branch of the case reliance in chiefly placed on some language found in the opinion in *Milwaukee Industrial School v. Milwaukee Co.* 40 Wis. 328, to the effect that the power exercised in making such commitments is clearly judicial and probably cannot be exercised by a judge at chambers. That was clearly an *obiter* remark,— an observation not called for by any question presented to the court for decision, and persuasive authority, only, because of the learning of the eminent chief justice who wrote the opinion. That he did not mean to say, nor the court to decide, that a judge of a court of record cannot exercise any judicial power other than when acting as a judge in court, is quite manifest. Any other theory would convict the court and judge of overlooking an express constitutional provision on the subject, and what had been, a very short time before, carefully considered and decided by the court.

The term "judicial power," which, by sec. 2, art. VII, of the constitution, is limited to courts, was clearly intended to cover powers similar to those which were exercised by courts in the trial of causes prior to the constitution, not matters of mere judicial administration, or those things of a judicial nature which had previously been exercised by a judge at chambers. There can be no mistake about that. Sec. 23,

art. VII, provides for the appointment of court commissioners to exercise powers equal to those of a circuit judge at chambers.   In *In re Kindling*, 39 Wis. 35, the court had this matter under consideration.   It was the precise question on which the case turned, and the court, by the chief justice who wrote the opinion in *Milwaukee Industrial School v. Milwaukee Co.*, said, in substance, that all those things which a judge at chambers could do before the constitution he can do under the constitution.   There can be no doubt but that a judge not presiding in court may do many and most things appertaining to mere judicial administration not requiring a trial according to the course of the common law, especially by legislative authority.   We have many statutes conferring such power that have never been successfully questioned if at all.   Sec. 2422*a*, Stats. 1898, in effect, empowers circuit judges out of term to transact all judicial work other than the trial of issues of fact.   It also empowers them to decide out of term any case tried in term time, and to direct the proper judgment to be entered.   That has been sustained by this court. *Silvernail v. Rust*, 88 Wis. 458.   Similar powers are exercised uniformly by judges of the federal courts, notwithstanding a clause in the federal constitution similar to that in our state constitution, and their right to do so has never been doubted so far as we know.   As to all matters of judicial administration not requiring a trial of an issue of fact the judge of the court is the court within the meaning of the constitution, and when such power is vested, by legislative enactment, in a judge of a constitutional court, it is vested in such court in the sense that the framers of the constitution used the term.   Such was early the view of this court as evidenced by numerous decisions.   In *Conrad v. Cole*, 15 Wis. 545, the right of a circuit judge at chambers to give judgment on a frivolous demurrer pursuant to a statute expressly authorizing the exercise of such a power, was challenged as unconstitutional.   It was held valid, attention being called to the

fact that the court had repeatedly sustained similar legislation. So on the question of the validity of the law as regards conferring judicial power to be exercised by a judge instead of by the court, we perceive no difficulty.

As to the contention that the law in question is unconstitutional because it authorizes restraint of personal liberty without a trial by jury, the answer is at least two-fold. First, a right of appeal is given to the circuit court as in cases of conviction of crime by justices of the peace. That preserves the guaranteed right of trial by jury. *Gough v. Dorsey*, 27 Wis. 119; *Forest Co. v. Langlade Co.* 76 Wis. 605. Second, the power to place children under proper guardianship has been exercised by chancellors and judges exercising chancery powers from time immemorial. Said Lord REDESDALE in 1828, in *Wellesley v. Wellesley*, 2 Bligh (N. S.), 124, the right of a chancellor to exercise such power has not been questioned for 150 years. Such a proceeding is not a trial for an offense requiring a common-law, or any, jury. It was never so regarded in England, nor has it been in this country in but few instances, notably cases in New Hampshire and in *People ex rel. O'Connell v. Turner*, 55 Ill. 280. That case was in effect overruled by later cases and is not now considered as authority. *Petition of Ferrier*, 103 Ill. 367; *McLean Co. v. Humphreys*, 104 Ill. 378. As said, in substance, in the *Ferrier Case*, the proceeding is not one according to the course of the common law in which the right of trial by jury is guaranteed, but a mere statutory proceeding for the accomplishment of the protection of the helpless, which object was accomplished before the constitution without the enjoyment of a jury trial. There is no restraint upon the natural liberty of children contemplated by such a law,—none whatever; but rather the placing of them under the natural restraint, so far as practicable, that should be, but is not, exercised by parental authority. It is the mere conferring upon them that protection to which,

under the circumstances, they are entitled as a matter of
right. It is for their welfare and that of the community at.
large. The design is not punishment, nor the restraint im-
prisonment, any more than is the wholesome restraint which
a parent exercises over his child. The severity in either
case must necessarily be tempered to meet the necessities of
the particular situation. There is no probability, in the
proper administration of the law, of the child's liberty being
unduly invaded. Every statute which is designed to give
protection, care, and training to children, as a needed sub-
stitute for parental authority and performance of parental
duty, is but a recognition of the duty of the state, as the
legitimate guardian and protector of children where other
guardianship fails. No constitutional right is violated, but
one of the most important duties which organized society
owes to its helpless members is performed just in the meas-
ure that the law is framed with wisdom and is carefully ad-
ministered.

The conclusions above expressed are in accordance with
adjudications elsewhere with but very few exceptions. *Roth
v. House of Refuge*, 31 Md. 330; *Ex parte Crouse*, 4 Whart. 9;
Tiedeman, Lim. § 50; *Prescott v. State*, 19 Ohio St. 185; *Peo-
ple ex rel. Van Heck v. New York Catholic Protectory*, 101
N. Y. 195; *Cincinnati House of Refuge v. Ryan*, 37 Ohio St.
197; *St. Mary's Industrial School v. Brown*, 45 Md. 310;
*Farnham v. Pierce*, 141 Mass. 203.

3 and 4. The remaining propositions may be best consid-
ered together. They challenge the power of the legislature
to employ private corporations or persons, at public expense,
to care for and maintain children whose welfare and that
of the community require such services to be rendered by
the state in default of natural and proper parental control
and maintenance. It is conceded that children dependent.
through poverty may be so maintained, therefore what we
shall say will be on the subject generally.

The learned trial court on this branch of the case, as well as respondent's attorneys, evidently relied on what was said in the opinion of this court in *Wis. K. I. Co. v. Milwaukee Co.* 95 Wis. 153. It is sufficient to say in regard to that case that the decision was plainly to the effect that adult persons, merely because addicted to the use of intoxicants, are not a class of helpless persons entitled to public protection and maintenance, notwithstanding power exists to restrain, and perhaps to reclaim, them, for reasons of a public nature; hence, that a law imposing on the public the cost of reforming, by private agencies, such persons who are not paupers, but, as indicated, merely suffering from those bad habits which adult persons are presumed to have power to guard against and are held responsible for failure to exercise it, is invalid. No public purpose, within any reasonable scope of the term, was discovered in the Keeley law. That was why it met the fate of legislation going beyond the boundaries of constitutional limitations. True, stress was put on the feature that the services of caring for the committed persons were performed by private agencies for private gain. But it was not decided that such feature alone was fatal to the law. The combination of it with the purely private service rendered showed that the entire scheme was private. The full controversy is covered by the following language by the chief justice who wrote the opinion: "The question recurs whether any county may be compelled to pay any private party for treatment, medicines, and board of any resident therein, having a disease not contagious or infectious, merely because such diseased person has not the means to pay for said treatment. If a county may be compelled to make such payment for treatment, . . . then it logically follows that every county may be compelled to pay any private parties for treatment of any person having any disease, though not contagious or infectious, provided the victim has not the present means of making such pay-

ment for himself." Stress was laid on the fact that, in order to enable a person to enjoy the benefits of the act, it was not requisite that he should be without means of paying therefor; destitution as to present means, money in hand, as it were, to make such payment, was all that was required. It was thus demonstrated that there was an absolute absence of any public purpose whatever covered by the law. Rightly understood, there is nothing in the decision condemning legislation for the use, under proper governmental control and supervision, of private agencies for the performance of public duty, or to conserve a public purpose, where such agencies are reasonably appropriate therefor. As well might the decision be read to condemn the employment of private agencies to construct public buildings or other improvements, or furnish water or light for municipal purposes, or to board and clothe destitute persons, as to include within its scope the care and maintenance of children of the classes mentioned in the law involved in this case. We think it is inferentially, if not expressly, held in the decision, that the state, even by private agencies, may care for persons affected with contagious diseases, or helpless by reason of infancy or other cause recognized as sufficient to render such persons proper subjects for state aid, maintenance, and control. The test to be applied in determining whether a particular agency may be employed by the state or some particular subdivision thereof by legislative authorization, to perform any particular work, is not whether the agency is public, but whether the purpose is public within the legitimate functions of our constitutional government. If the purpose be public and constitutional, and the agency be an appropriate means to accomplish it, and not expressly or by necessary implication prohibited by state or national constitution, its employment, under reasonable regulations for control and accountability to secure public interests, is legitimate and constitutional. The principle involved was dis-

Wisconsin Industrial School for Girls vs. Clark County.

cussed at great length in *Attorney General v. Eau Claire*, 37 Wis. 400, and *Lund v. Chippewa Co.* 93 Wis. 640. In the *Eau Claire Case* it was in effect held that the taxing power of the state is limited only by the use for which it is exercised. If such use be public, the exercise of the power to promote it is constitutional, otherwise not. As indicated in *Curtis's Adm'r v. Whipple*, 24 Wis. 350, it is not sufficient that an enterprise be one in which the public are interested and which might be conducted at public expense, to warrant the using of the taxing power to aid it *ex donatio;* but it may be used for the purpose of compensating for an equivalent in public service rendered under proper regulations to protect municipal interests, unless the particular governmental function to which it relates is expressly or by necessary implication restricted to public agencies.

Applying the foregoing to the case before us, as to the purpose of the law called in question, for time reaching back as far at least as the records of English civilization the protection and care of infants has been presumed to belong to sovereign power, though rightly exercised by parents and guardians so long as not neglected or abused. Such sovereign right and the duty to exercise it within reasonable limits, whenever necessary to promote the welfare and safety of children, has always been recognized. The power has been customarily exercised in such appropriate ways as legislative wisdom deemed best, when there was legislation on the subject, and otherwise by courts of equity or judges having chancery powers in such ways as were properly within the scope of their jurisdiction. Where parental duty for any cause is not performed, the state, through its appropriate agencies, succeeds thereto, not as an original right, but a resumption of a right delegated to parents as the natural guardians of their children, the persons under natural conditions having the most effective motives and inclinations and being in the best position and under the strongest obli-

gations to give to such children proper nurture, education, and training. In cases of necessity, however, children become the wards of the people as a whole, with the duties that spring from that relation. It would be impossible to suggest a higher public duty than that of protecting and caring for minors who would otherwise suffer in body, mind, and morals, and quite likely in years of maturity be numbered among the vicious and criminal classes, the lost of time and eternity, the greatest enemies of life and property, of health and happiness. As said by an eminent writer on the subject of constitutional powers: "There can be no doubt that in its capacity of *parens patriæ* the state can and should make provision for the care and education of these wards of society, not only for the protection of society, but also for the benefit of the children themselves." That duty is particularly important as regards girls within the years of minority. As said in *McLean Co. v. Humphreys*, 104 Ill. 378: "It is an unquestioned right and imperative duty of every enlightened government in its character of *parens patriæ* to protect and provide for the wants and welfare of persons who from . . . infancy are unable to care for themselves. The performance of that duty is justly regarded as one of the most important governmental functions and all constitutional limitations must be so understood and construed as not to interfere with its appropriate and legitimate exercise." The helpless character essential to the public duty mentioned is by no means confined to the mere circumstance of poverty. The helplessness and indiscretion of minority are amply sufficient to call into exercise the power of the state, if necessary, to relieve and so care for, protect, and give to the being so circumstanced an opportunity to become a worthy member of the community in which it may reside on coming to the years of discretion. Unlike the mere private purpose of the so-called Keeley law, which was condemned, the reformation and care of

helpless children, particularly of infant girls without parental protectors to perform that service, is a public duty of the very highest moment, which cannot be better performed than by organizations composed of ladies or ladies and gentlemen, who, through love of children. and desire to promote their welfare, band themselves together for that purpose as contemplated by the law under which the appellant exists.  That the state may make such corporations legitimate municipal agencies to perform such duties under state supervision, cannot be doubted.  That is the view entertained by substantially all courts that have considered similar laws.  It is in accordance with legislative policy generally, as expressed by legislative enactments in most of the. states of the Union from time to time, almost from the foundation of the government.

What has been said meets adversely to the order appealed from all the grounds upon which it is attempted to be supported in this court.

*By the Court.*— The order appealed from is reversed, and the cause remanded for further proceedings according to law.

A motion for a rehearing was denied September 26, 1899.

The commitment of minors to reformatories without conviction of crime is the subject of a note to *State ex rel. Olson v. Brown* (50 Minn. 353), in 16 L. R. A. 691.—REP.